CHRIS–CRAFT INDUSTRIES, INC.,
Plaintiff,

v.

INDEPENDENT STOCKHOLDERS COM-
MITTEE et al., Defendants.

Civ. A. No. 4284.

United States District Court,
D. Delaware.

Jan. 16, 1973.

Robert K. Payson, of Potter, Anderson & Corroon, Wilmington, Del. and Stephen M. Axinn, Stuart L. Shapiro and David J. Olesker, of Skadden, Arps, Slate, Meagher & Flom, New York City, of counsel, for plaintiff.

Stuart B. Young, of Young, Conaway, Stargatt & Taylor, Wilmington, Del. and Theodore R. Mann, Barry E. Ungar and Steven E. Angstreich, of Mann & Ungar, Philadelphia, Pa., of counsel, for defendants, Independent Stockholders Committee, Richard O. Kelly, David Cohen, Richard R. Balsbaugh, Andrew Schnell, Jr., Barry Lichtman, Lowell Harmon Duggan, William M. Duke and John P. Bates.

John R. Bowman, of Connolly, Bove & Lodge, Wilmington, Del., for defendant, James Hinz.

Edward B. Maxwell, 2nd, of Young, Conaway, Stargatt & Taylor, Wilmington, Del. and Carl F. Goodman and Michael Nussbaum, of Surrey, Karasik & Morse, Washington, D. C., of counsel, for defendants, Rafael Benitez, Abe Pollin and Willard Long Thorp.

## OPINION

LATCHUM, District Judge.

This action arose out of a battle for corporate control between the management of Chris-Craft Industries, Inc. ("management") and a dissident group known as the Independent Stockholders Committee [1] (the "Committee"). Both sides allege that the proxy materials sent by their opponents to Chris-Craft shareholders in connection with the solicitation of proxies for the 1972 Annual Shareholders Meeting, held on January 11, 1972 in Cortland, New York, were violative of Section 14 of the Securities Exchange Act of 1934 ("the Act"), 15 U.S.C. § 78n, and the Rules and Regulations promulgated thereunder. Both sides seek damages and costs, including attorneys' fees, as well as a permanent

---

1. To distinguish the parties in this litigation, the management of Chris-Craft will be referred to as plaintiff, and the parties aligned with the Committee shall be referred to as defendants.

injunction against further violations of the Act by the other side. Jurisdiction and venue exist by virtue of Section 27 of the Act, 15 U.S.C. § 78aa.

It is well established that a private party may bring suit for a violation of Section 14 of the Act. J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); Dillon v. Berg, 326 F.Supp. 1214 (D.Del.1971), aff'd 453 F.2d 876 (C.A. 3, 1971). It is also settled that an award of damages and, in some instances, attorneys' fees are an appropriate remedy for private litigants who establish violations of the Act. Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). Likewise injunctive relief may be granted to a private litigant. Studebaker Corp. v. Gittlin, 360 F.2d 692 (C. A. 2, 1966); II Loss, Securities Regulation 956. Thus each side has standing to bring their respective claims and counterclaims.

A fifteen day non-jury trial was held from June 12 to June 23 and from July 31 to August 4, 1972. Numerous documentary exhibits and depositions were put into evidence by both sides during the trial. Post trial briefing was completed on November 13, 1972 so that the case is now ripe for decision. A short history of the facts giving rise to the litigation follows.

The genesis of the present suit was the dissatisfaction of a group of substantial Chris-Craft shareholders in 1970 over the poor performance of the corporation reflected by the earnings report for the fiscal year 1969. Defendants Barry Lichtman ("Lichtman") and James Hinz ("Hinz"), who were stockbrokers by occupation, arranged a meeting on February 25, 1970 in Chicago attended by a number of dissatisfied shareholders, including some of the present defendants, at which their grievances were discussed. Pursuant to a general agreement arrived at during the meeting, a delegation was sent to meet with Chris-Craft management to demand representation on the Board of Directors. However, optimistic forecasts of profits for fiscal year 1970 were made to the delegation by Chris-Craft management at the latter meeting, so they dropped their demands and returned home. When the 1970 annual report was issued, it showed even greater losses during fiscal year 1970 so another meeting was held in Chicago in August of 1970 in which various methods of takeover, including a proxy fight, were discussed. However, this latter approach was abandoned when the defendant David Cohen ("Cohen"), an attendant at the 1970 meetings, suggested that the group did not have the financial resources to wage a proxy battle. (Tr. 1610–11; 1741).[2] As a consequence, no action was taken by the attendants at the meeting.

No significant action occurred for several months. Then in February or March of 1971, defendant Richard O. Kelly ("Kelly") was contacted by Gale Cooper ("Cooper"),[3] a franchised Chris-Craft dealer in Texas, who informed him that Chris-Craft could be acquired. (Tr. 853–854). Cooper told Kelly he was working closely with John Gale ("Gale"),[4] a vice-president of the Chris-Craft Boat Division. (Tr. 855). The three then had a meeting a short time later in Los Angeles. (Tr. 856). Cooper and Gale indicated that they wanted to help Kelly gain control of Chris-Craft by acquiring Chris-Craft stock in exchange for assets in other companies that Kelly supposedly controlled. Gale also stated that for the help he would give he wanted to be president of the Boat Division and Cooper wanted to receive Chris-Craft stock as a finder's fee. (Tr. 856–857; 863). Another meeting was held in April, 1970

---

2. Tr. refers to the trial transcript, PX to the plaintiff's exhibits, CCX to the defendants' counterclaim exhibits, Dep. to the depositions, and Compl. ¶ to the Complaint paragraphs.

3. Cooper, a defendant in the original complaint, was granted a severance from the defendants in this action.

4. Gale was also granted a trial severance.

which was attended by Kelly, Gale and Martin Tynan ("Tynan"), a financial vice-president of Chris-Craft. Gale and Tynan urged Kelly to take over to save the company. (Tr. 868). A meeting was arranged for Kelly and Charles Reed ("Reed"), his attorney, with Chris-Craft's management on May 17, 1971 in New York. At this meeting nothing was settled. Management indicated a lack of enthusiasm for Kelly's general proposals to acquire control of Chris-Craft.

Another meeting was held by the dissidents at Fort Lauderdale, Florida on June 6th. This was attended by Kelly, Reed, Gale, Lichtman and Tracey Van Buren, an employee of Chris-Craft. Kelly was urged to go ahead with the plan to attempt a takeover of Chris-Craft by an exchange of assets. (Tr. 885–886). Lichtman indicated that he had spoken to several shareholders who were unhappy with present management and would likely support him. (Tr. 885–886).

A second meeting was held in Florida on July 6 attended by Kelly, Gale, Lichtman and Reed. It was proposed that Reed prepare a support letter to be sent to Kelly by substantial shareholders indicating their support for his acquisition proposals, with which he would then confront management. (Tr. 164). There were also discussions concerning the possibility of a proxy fight or instituting a derivative suit in the event Kelly's proposals to management were still rejected. (Tr. 165, 900). Gale volunteered to get a list of shareholders in case a proxy fight became necessary. (Tr. 902).

A cover letter requesting support was sent out on July 9, 1971 to the names suggested at the July 6 meeting. Among those contacted were the defendants Robert Kritzik ("Kritzik"),[5] Andrew Schnell ("Schnell"), Richard Balsbaugh ("Balsbaugh"), Cohen and Hinz, who for the first time became aware of Kelly's acquisition plans.

Another meeting with management was held in New York on July 23 attended by Kelly and Reed. (Tr. 252). At this meeting Reed displayed a draft complaint of a derivative suit against Chris-Craft ostensibly prepared by discontented shareholders. (Tr. 944). At the meeting Kelly disavowed giving encouragement to the group and assured management he could persuade the group to drop the proposed action if management allowed him to take over by his plan. (Tr. 252–253). At this time Kelly provided them with the names of the companies he was suggesting for the merger but management indicated it could take no action unless he supplied more particulars with respect to his companies.

A meeting was held in Cohen's office in Philadelphia on August 4, 1971, attended by Cohen, Kelly, Reed, Lichtman, Kritzik, Gale, Schnell, Balsbaugh and Norman Berman ("Berman"), a Philadelphia stockbroker, during which Kelly explained in more detail his package proposal. (Tr. 338). The likelihood of success of his plan was discussed along with the possibility of a tender offer or a proxy fight, in which case it was believed that a shareholder's list would be needed. (Tr. 363). By this time it had become apparent that Gale would not be able to obtain a list since he had been discharged by Chris-Craft the day before. The consensus was that the group would adopt a wait-and-see attitude until management acted definitively on Kelly's proposal. (Tr. 1006).

Kelly and Reed again met with management on August 11 concerning his proposals. (Tr. 1007). Management explained the type of companies they were interested in and Kelly agreed to make arrangements accordingly. On August 23 Reed made an offer to Chris-Craft on Kelly's behalf to buy one million shares at five dollars a share. (Tr. 1013). On August 30 the offer was modified to suggest that Chris-Craft acquire certain companies controlled by

---

5. Kritzik was also granted a severance from the trial.

Kelly for the one million shares. (Tr. 1015). On September 3 Kelly sent Chris-Craft a list of the companies he proposed and set a deadline of September 13 for accepting his offer. (PX 76). On September 8 Chris-Craft wrote to Kelly rejecting his latest offer on the grounds that it failed to provide adequate information on the status of the companies offered. (PX 37).

On September 23 the dissidents held another meeting in Reed's Washington office attended by Kelly, Reed, Gale, Cohen, Lichtman, Balsbaugh, Schnell, Berman and Mebus Bartling ("Bartling"). (Tr. 1030). In the face of the rejection of Kelly's offer, they discussed the possibility and cost of a proxy fight. Cohen, Kelly, Schnell and Balsbaugh agreed to contribute for such a contest. (Tr. 442). The others indicated that they did not want to become participants in a proxy fight. Nevertheless, everyone filled out forms which solicited information necessary to file a Schedule 14B with the Securities Exchange Commission ("SEC"). (PX 81–88). The consensus was that, upon condition that the funds pledged for the proxy contest were deposited to the Committee's account between that time and the next meeting on October 16, they would go ahead with a proxy fight. (Tr. 1591–1592). It was noted that a shareholder list was necessary and Gale agreed to find director-nominees. (Tr. 1039). At the meeting on October 16 in Reed's law offices attended by Kelly, Reed, Cohen, Balsbaugh, Schnell, Gale and Lichtman it was determined that the condition had been met and that they would proceed with the proxy contest. (Tr. 595–596). The Independent Shareholders Committee was then formed with Balsbaugh as Chairman and Cohen, Kelly and Schnell as members. They authorized the filing of Schedules 14B on their behalf and a public announcement of their intentions, (Tr. 595–596), which was done on October 18. (Tr. 597).

On October 23 Schnell filed a demand with management for a shareholder list. (Tr. 395). After being refused, he brought suit in the Delaware Court of Chancery. The Chancery Court ordered a shareholder list turned over to Schnell in late November. In November, the Committee also announced its list of director-nominees. Those nominated included Balsbaugh, Cohen and Kelly as well as "outsider nominees", defendants Willard Thorp, Abe Pollin, Lowell Duggan, Willam Duke, John Bates and Rafael Benitez. From November, 1971 through early January, 1972 both sides mailed proxy solicitation materials to Chris-Craft shareholders containing charges and counter-charges. Chris-Craft charged among other things that Kelly had several criminal convictions in his background. At a meeting on December 4 attended by all Committee members and director-nominees plus Gale, Martin Spaatz, a former Chris-Craft employee, Lichtman and Harvey Porter ("Porter"),[6] Kelly gave his version of Chris-Craft's accusations. (Tr. 627). In addition everyone attending was made aware of the complaint filed against them which ripened into the instant action. (Tr. 647). Later in the face of these accusations, Kelly resigned from the Committee on December 14. (Tr. 1154).

Both sides have made numerous allegations against the other based on their conduct throughout the proxy battle. Each allegation will be treated separately.

## I. CHRIS-CRAFT'S ALLEGATIONS.

A. *That The Defendants Knowingly Commenced An Extensive Unlawful Solicitation Of Chris-Craft Stockholders No Later Than July, 1971 In Violation Of The Proxy Rules.*

Chris-Craft contends that solicitation letters were written to more than ten substantial shareholders of Chris-Craft in July of 1971, that this occurred without prior filing with the SEC as re-

---

6. Porter was also granted a severance as to trial.

quired by Rule 14a–6, 17 CFR § 240.-14a–6, and prior to the filing of any Schedules 14B, 17 CFR § 240.14a–102, by the participants. Management argues that, although these letters were not themselves proxy solicitations, they were intended to prepare the way for the success of a proxy contest in the event that management refused to surrender control of the company via Kelly's proposals. It further contends that a proxy battle was being contemplated and planned as far back as 1970 at the meetings that were attended in February and August of that year by several of the defendants, and that the meetings in April, May, June and July of 1971 were but a continuation of this long-standing overall plan. The Second Circuit has held that solicitations subject to the Proxy Rules also include writings which are (1) part of a continuous plan ending in solicitation and (2) which prepare the way for its success. Securities and Exchange Commission v. Okin, 132 F.2d 784, 786 (C.A. 2, 1943); Studebaker Corp. v. Gittlin, 360 F.2d 692, 696 (C.A. 2, 1966).

The defendants' position is that the letters were not intended as a pre-filing solicitation of proxies but were intended to be shown to management as a sign of stockholder dissatisfaction and as support for Kelly's merger proposals. They also maintain that no more than ten persons were contacted, so that in any case, the letters were exempt from the filing requirement of Rule 14a–6 by Rule 14a–2(a), 17 CFR § 240.14a–2(a).[7]

Thus, in order for the Court to find a violation of Rule 14a–6, it must determine that more than ten persons were contacted and that the letters were solicited as part of a continuous plan ending in, and in aid of, a proxy solicitation.

As to the number of shareholders, the Court finds that more than ten were contacted. Those contacted included Kritzik, Richard Taugher, Balsbaugh, Schnell (PX 31), Cohen (PX 32), Bartling (PX 33), Robert Heller (PX 108), Stephen Ross (Tr. 1830), Arthur Gray (Tr. 909), Hinz (Tr. 1003–1004) and Alfred Hollander. (Tr. 241, 571–573).

However, the Court is not convinced that the letters were obtained with the intention of aiding an eventual proxy solicitation. During the meeting in Chicago in August, 1970, the idea of a proxy fight was discussed. (Tr. 1610). Cohen informed the others attending that there was not sufficient financial strength in that group to wage a proxy battle (Tr. 1610–1612). This position was accepted. Of course, the group remained dissatisfied with the performance of the company, and when Kelly appeared on the scene in the following year, it appeared to Gale and Lichtman that the expense of a proxy fight could be avoided. Kelly apparently made an impressive appearance, which lent credence to his statements that he was prepared to take over Chris-Craft by merging companies with 50 million in assets and 5 million in annual earnings in exchange for a sizeable portion of Chris-Craft stock. This impression was shared by those who met him later, such as Cohen, Schnell and Balsbaugh. They actually believed that a peaceful takeover could be achieved, and only later, when Kelly's proposals were rejected by Chris-Craft, did they decide to attempt a proxy battle. Moreover, they only decided to take that drastic step because they still believed Kelly was a man of prominence who could provide considerable financial backing to such a contest. Lending credibility to this version is the fact that Kelly was the only addition to

---

7. Rule 14a–2, 17 CFR § 240.14a–2 provides:

"Sections 240.14a–1 to 240.14a–11 apply to every solicitation of a proxy with respect to securities registered pursuant to Section 12 of the Act . . . except the following:

(a) Any solicitation made otherwise than on behalf of the mangement of the issuer where the total number of persons solicited is not more than ten."

the dissident group after August, 1970 when the idea of a successful proxy battle had been rejected as beyond their capabilities.

Nor has it been proved that Kelly planned to make vague offerings as a subterfuge for gathering the support of dissidents so that he could lead a proxy battle. It appears more likely to the Court that he believed he could obtain a controlling interest in Chris-Craft at a comparatively low cost by acquiring Chris-Craft shares in exchange for practically worthless companies and in aid of this scheme, he planned to use the support letters of dissatisfied substantial shareholders to force management into submission. This view is strengthened by the fact that he later used the threat of a derivative suit in addition to the letters to try to force the mergers. (Tr. 265, 944).

■ In light of these facts the Court concludes that the interest in obtaining the letters of support was to demonstrate to the management of Chris-Craft that Kelly had considerable shareholder support for his merger proposals and was not intended to prepare the way for a proxy solicitation. Thus the second part of the *Okin* test is not met and the communications were not in violation of Rule 14a–6.

B. *Numerous Undisclosed Participants.*
(1) *Gale's undisclosed participation.*[8]

Chris-Craft alleges that Gale was throughout an active participant, and that he was in violation of SEC rules in that he never filed a Schedule 14B as required by Rule 14a–11(c), 17 CFR § 240.14a–11(c). Chris-Craft contends that prior to September 23, 1971 Gale was instrumental in bringing Kelly and Lichtman together, that he helped furnish the names for the Kelly support letter, and that he attempted to obtain a shareholder list. Since the Court has found in Subdivision (A) above that there was no intent to enter a proxy battle until September 23, Gale's activity prior to that date cannot be regarded as participation in a proxy contest.

■ Chris-Craft's second contention that he was an active participant after September 23 is well founded. The evidence shows that he contacted Ellie Dowd and George Putnam with regard to becoming director-nominees, (Tr. 1039–1041, 1956–1958; Gale Dep. 118–119), that he attended the December 4 meeting, (Tr. 641; PX 61), and got Martin Spaatz, a former employee who could provide vital information to the Committee, to attend. (Tr. 627–628; Gale Dep. 137–140). In fact it was acknowledged that Gale's inside information would be needed in waging a successful proxy fight, so that he was considered a participant by the others in fact if not in name. (Tr. 1041). Thus, it appears Gale was at least as active in aiding the proxy contest as were some of the Committee members. Under Rule 14a–11(b)(3), 17 CFR § 240.14a–11(b)(3),[9] he qualifies as a participant, and his failure to disclose his identity as a participant by filing a Schedule 14B was a violation of Rule 14a–11(c). Securities and Exchange Commission v. May, 134 F.Supp. 247, 256–257 (S.D.N.Y.1955), aff'd 229 F.2d 123 (C.A.2, 1956); Securities and Exchange Commission v. Henwood, CCH Fed.Sec.L.

---

8. Although Gale was granted a trial severance, it is necessary to consider whether his conduct made him a participant in the proxy contest in which event his participation could be attributable to the Committee and the other defendants.

9. Rule 14a–11(b), 17 CFR § 240.14a–11(b) provides:
 "For purposes of this rule the terms 'participant' and 'participant in a solicitation' include the following:

(3) Any committee or group which solicits proxies, any member of such committee or group, and any person whether or not named as a member who, acting alone or with one or more persons directly or indirectly take the initiative, or engages, in financing, directing, or arranging for the financing of, any such committee or group."

Rep. ¶ 91,125 at 93,713–8 to 93,713–9 (S.D.Cal.1961), modified and aff'd per curiam sub nom. Henwood v. Securities and Exchange Commission, 298 F.2d 641 (C.A.9, 1962), cert. denied 371 U.S. 814, 83 S.Ct. 25, 9 L.Ed.2d 56 (1962).

However, Chris-Craft's third contention that there was an understanding that Gale would be part of management in the event that the dissidents were successful had not been proved. In fact testimonial evidence indicates there had been no definite decision on who would run the company. (Tr. 461–462, 1961, 2866).

### (2) *Kritzik's undisclosed participation.*[10]

For the same reasons as discussed with regard to Gale, Kritzik's alleged participation prior to September 23, namely that he solicited support letters for Kelly from shareholders, cannot be regarded as participation in a proxy battle.

Of more consequence is the charge that Kritzik contributed $25,000 to the Committee, which rendered him a participant under Rule 14a–11(b)(4), 17 CFR § 240.14a–11(b)(4), and required the filing of a Schedule 14B.

■ The Court finds, however, that no contribution was made by Kritzik. What transpired was that on November 21, 1971 Kritzik gave Cohen a note for $25,000 on the condition that the note not be used unless or until he received permission from his employer, Ralston & Co., to become a participant. (Tr. 1490–1492). When approval from his employer was denied, he told Cohen he could not use the note, and the two decided to forget about his contributing. (Kritzik Dep. 80–82). Thus, Kritzik never became a participant in the proxy fight and was under no duty to file a Schedule 14B.

### (3) *Cooper's undisclosed participation.*[11]

■ Chris-Craft contends that Cooper became a participant by virtue of a $25,000 loan made to Kelly, which enabled Kelly to make good his pledge of a contribution of that amount as he had reported on his Schedule 14B. Cooper never filed a Schedule 14B. Cooper's position is that he was making a personal loan to Kelly so that Kelly would not commit a Securities violation in failing to fulfill his commitment, and thus, Cooper contends, he himself was not making a contribution to the proxy contest. While a personal loan to someone who then uses the borrowed money to contribute to a proxy fight might not render the lender a participant in the proxy battle, the Court finds that under the facts of this case, Cooper's loan cannot be segregated so easily from the proxy contest. Cooper himself was very interested in the outcome of the proxy fight. In fact it was Cooper who was acquainted with Kelly prior to Kelly's involvement with Chris-Craft and it was Cooper who first induced Kelly to attempt to take over control of the company. (Tr. 853–54). Thus, it is obvious that Cooper was interested in seeing the incumbent management of Chris-Craft turned out, and when he made the loan to Kelly (Tr. 498; 559; 587), it can be reasonably inferred that a substantial portion of his motivation was directed toward influencing the battle for control of Chris-Craft in favor of the Committee. Therefore, he must be regarded as a participant under Rule 14a–11(b)(5), 17 CFR § 240.14a–11(b)(5), and his failure to file a Schedule 14B is a violation of Rule 14a–11(c).

However, Chris-Craft has not proved its contention that the *quid pro quo* for Cooper's loan to Kelly was the promise of a Chris-Craft distributorship to Cooper in the event the Committee was successful.

---

10. Although Kritzik was granted a severance, his possible participation must be considered for the same reason as expressed in Footnote 8.

11. Although Cooper was granted a severance, his possible particiation must be considered for the same reasons as expressed in Footnote 8.

**(4)** *Berman's undisclosed participation.*[12]

■ Berman, a stockbroker who became involved in the proxy battle through his acquaintance with Lichtman, appeared as a minor character throughout the trial testimony. This was reflected in Chris-Craft's post-trial brief which limits its contention that Berman was a participant to one event. They allege that at a meeting in Cohen's office on November 18, 1971 Berman called shareholders to solicit proxies, and in so doing identified himself to the shareholders as Cohen or Kelly. Chris-Craft contends that these telephone solicitations made Berman a participant and that his failure to file a Schedule 14B was in violation of Rule 14a-11(b)(6), 17 CFR § 240.14a-11(b)(6). The Court finds that Berman did place calls to shareholders from Cohen's office (Tr. 1088), but the testimony was uncontradicted that the calls were made only to verify that the shareholder list recently supplied by Chris-Craft was accurate. (Tr. 3118). No evidence was introduced that Berman did any more than inform the persons he called from the list that a proxy battle was going on and that he was verifying that those he called were actually Chris-Craft shareholders. Berman's limited activity did not give rise to the status of a participant under any of the definitions in Rule 14a–11(b), and therefore he was not required to file a Schedule 14B.

**(5)** *Scientific Control Corporation's ("SCC") participation.*[13]

Chris-Craft contends that SCC, a corporation in which Kelly had a controlling interest, was a participant by virtue of paying for attorney Reed's legal bills prior to September 23, 1971. As previously indicated, since there was no activity relating to a proxy battle prior to September 23, SCC's payment of the le-

gal bills cannot be regarded as participation in a proxy fight.

■ Chris-Craft further contends that SCC also became a participant under Rule 14a–11(b)(4) by financing Kelly's purchase of 5,000 shares of Chris-Craft stock and by giving a note for $100,000 to Kelly from which he was able to make a second contribution of $25,000. Kelly's explanation at trial was that the $100,000 note and the money used to buy the stock represented money owed to him by SCC. (Tr. 1119; 1138). Since this testimony stands uncontradicted, Chris-Craft has not met its burden of proving that the sums represented an illegal contribution by SCC. Thus, SCC was not a participant and was not required to file a Schedule 14B.

**(6)** *Mebus Bartling's and Allen T. Archer Co.'s ("Archer Co.") undisclosed contribution.*[14]

■ Chris-Craft contends that Bartling and his employer Archer Co. made a contribution of $5,000 to the proxy fight. The evidence indicates that Bartling gave Reed a check drawn on Archer Co. (PX 73). Apparently the check was given on the condition that it was to be used only if they could make the contribution without being considered participants. (PX 80). Reed then deposited the check in the account of his law firm and nothing more was said. After the election at the 1972 Chris-Craft Shareholders meeting, Bartling wrote to Reed claiming that since it had been determined that they could not make a contribution without becoming a participant, the money should be returned. (PX 80). Reed then sent them a check for $5,000. (PX 77). The defendants claim that the money was never used so that Bartling and Archer Co. contributed nothing and were not participants. The Court rejects this position

12. Even though Berman was not named a defendant, his possible participation in the proxy contest must be considered for the same reasons given in Footnote 8.

13. SCC was not a named defendant but its possible participation in the proxy con-

test must be considered for the same reasons stated in Footnote 8.

14. Although Bartling and Archer Co. are not named as defendants, their possible participation must be considered for the reasons given in Footnote 8.

as untenable. Since the check was cashed and the funds remained in the account of the law firm representing the Committee and apparently available to the Committee, it can scarcely be said that the funds were not used. (Tr. 450). In essence what transpired was that Bartling and Archer Co. made a contribution and when it became apparent the fight was lost they asked for their money back. The consequence of a return of money after the proxy fight was over has no bearing on whether the contribution was made initially. For this reason the Court finds that Bartling and Archer Co. made a contribution of $5,000 to the proxy contest, became participants thereby under Rule 14a–11(b)(4) and were required to file a Schedule 14B. Their failure to do so was a violation of Rule 14a–11(c).

### (7) *Hinz's undisclosed participation.*

All of the alleged activity of Hinz appears to have occurred prior to September 23, 1971 and so for reasons previously stated in Subdivision (A) above, he can not be deemed a participant.

### (8) *Other undisclosed participants.*

Chris-Craft contends that shareholder Lou Gatti became a participant by soliciting a support letter from Donald Boyle ("Boyle"), (PX 96), that Boyle in turn became a participant by soliciting others, (PX 96), and that a shareholder named Donald Krueger also solicited other shareholders.[15] (PX 97). For reasons previously stated in Subdivision (A) above, any activity conducted prior to September 23, 1971 did not amount to participation in preparation for a proxy fight, and therefore none of the trio was required to file a Schedule 14B.

### C. *Cohen's Legal Incapacity To Wage The Proxy Fight.*

██ Chris-Craft asserts that Cohen served as attorney for Chris-Craft and was the recipient of confidential information with respect to the Piper stock acquisition and the Colonial Realty merger, two transactions of management attacked in the Committee's proxy solicitation materials, and as a result was legally incapacitated to use these two issues against Chris-Craft in the literature disseminated as part of the proxy battle. (PX 12). In addition Chris-Craft claims that Cohen's failure to reveal his role of counsel to Chris-Craft in these transactions renders false and misleading the proxy solicitation materials disseminated by the Committee and makes them violative of Rule 14a–9, 17 CFR § 240.14a–9. Chris-Craft cites a number of cases which hold that where one serves as an attorney to a client in a certain transaction, he may be barred from taking a position adverse to his client in any litigation involving that transaction. Here, however, the alleged wrongful conduct was that he published material prejudicial to Chris-Craft in the proxy fight which had been obtained in a confidential atmosphere while previously serving as counsel for Chris-Craft in those very transactions under attack. A proxy battle *per se* is not litigation. The connotation of the phrase "legal incapacitation" is that Cohen would be barred from asserting wrongdoing on the part of Chris-Craft in those transactions in a court of law. If Cohen did disclose during the proxy fight, material which he had previously received in confidence as Chris-Craft's attorney, his conduct would have been a breach of the Canon of Professional Ethics; however, no securities rules would have been broken by so doing.[16]

██ In answer to Chris-Craft's assertion that his failure to reveal his role as attorney to Chris-Craft in the two transactions rendered the proxy materials false and misleading, the defendants point out that Schedule 14B, Item 4(b)

---

15. Gatti, Boyle and Krueger were not named as defendants but their possible participation must be considered for the reasons set forth in Footnote 8.

16. Cohen's alleged legal incapacity will be discussed more thoroughly with regard to the Committee's counterclaim.

and Schedule 14A, Item 7(f) would only require revelation of roles in transactions which have occurred since the beginning of Chris-Craft's last fiscal year, which began September 1, 1970, and Cohen's alleged role as attorney in those transactions was completed prior to May 28, 1970. (Tr. 2000–2005). They contend, therefore, that the omission of his role as an attorney was not a violation of those proxy rules. Yet, this does not end the matter; the omissions may still be false and misleading and in violation of Rule 14a–9, because, if the shareholders had been aware that Cohen, serving as attorney, helped to consummate those transactions, their judgment of the credibility of his claim that the transactions were a disaster for Chris-Craft could have been affected. Therefore, it is necessary to determine whether Cohen in fact served as attorney for Chris-Craft in those transactions, and if so, the extent of his participation. In spite of Cohen's claims to the contrary, the Court finds that Cohen performed legal services in connection with both transactions for Chris-Craft for which he was compensated. (Tr. 2005, 2027). However, in addition the Court finds that the legal role he played was a limited one. In both instances his contact with the transactions was minimal, only involving in both a phone call to someone he knew, (Tr. 1377, 1404), and in addition in the Colonial Realty case, reviewing a brief. (Tr. 3142). From this limited contact, he obviously was in no position to determine the wisdom of the transactions from Chris-Craft's point of view. Thus, if the shareholders had been aware of his limited role as attorney their judgment as to the credibility of the claims of the Committee would not have been affected. Thus the omission of this information did not render the proxy materials false and misleading.

D. *False and Misleading Schedules 14B.*

(1) *Cohen's 14B schedule.*

Chris-Craft contends that Cohen's Schedule 14B was false and misleading in three respects: first, it failed to mention that Cohen purchased and sold $500,000 worth of debentures in the previous two years; second, it did not reveal that almost all of his securities were pledged as repayment for loans (Tr. 1448); third, it did not reveal the agreement that Cohen, Kelly and Duke would run the company, and that Gale would become part of management.

■ The evidence reveals that Cohen sold some of his debentures for over $50,000 profit within the 2 years prior to filing a Schedule 14B and did not reveal the profit in his Schedule 14B. (Tr. 1441). Schedule 14B, Item 3(c) requires that all participants reveal all securities bought or sold within the past 2 years and the amount at which they were purchased or sold. Thus for this omission, Cohen was in violation of Rule 14a–11(c), 17 CFR § 240.14a–11(c).

■ Nowhere in Schedule 14B was Cohen required to reveal that some of his stock was pledged. Therefore there was no violation of Rule 14a–11(c) by its omission.

■ Chris-Craft has not proved to the Court that any agreement existed as to prospective management of the company if the dissidents were successful. While it was presumed that the leaders of the proxy fight would run the company, (Tr. 1074–1075), this is the case with any proxy battle. Schedule 14B, Item 4(c) only contemplates disclosure where the arrangement is relatively concrete. The absence of any such statement in Cohen's Schedule 14B was not violative of Rule 14a–11(c).

(2) *Kelly's 14B schedule.*

For the reasons stated previously in Subdivision (A) above, the Court does not consider Kelly's activity with respect to Chris-Craft prior to September, 1971 to have been participation in a proxy battle. However, Chris-Craft also alleges that other false and misleading statements were made in Kelly's Schedule 14B.

■ Chris-Craft claims that Kelly's Schedule 14B was untrue because it stated that he had within the past 2 years bought and sold 9,300 shares of stock which he had in fact never controlled. Kelly's explanation was that his broker had used his own money to buy the stock in his own name, but was under a verbal agreement to hold them in trust for Kelly until he could pay for them, and that the subsequent sale by the broker without Kelly's knowledge or permission was a violation of that agreement. (Tr. 1132). The objective evidence reveals that another individual unrelated to this litigation bought and sold 9,300 shares of Chris-Craft stock. Kelly's name appears in neither transaction. The Court is unconvinced by Kelly's explanation, and therefore finds that Kelly did not buy and sell the stock and consequently his Schedule 14B was false in this respect and constitutes a violation of Rule 14a–11(c).

■ Chris-Craft also claims that Kelly's Schedule 14B was false and misleading in its assertion that Kelly bought an additional 5,000 shares in October, when in fact they were not paid for until December and then only with funds advanced from SCC. Since Kelly ultimately paid for them, it was reasonable for him to regard the transaction as occurring when the shares were transferred and not when payment was made. In addition, as previously indicated in Subdivision (B)(5) above, Kelly's explanation that the money was in repayment of a loan made to SCC has not been contradicted (Tr. 1138), so that the Court cannot regard the payment for the shares to have been made with anything other than his own funds. Thus the Court finds no violation in Kelly's statement that he had bought an additional 5,000 shares of Chris-Craft stock.

Chris-Craft also asserts that Kelly's Schedule 14B failed to reveal an agreement that, if successful, he, Cohen and Duke would run the corporation and that Gale would have a management position. As previously indicated, this charge has not been proved by competent evidence.

■ Chris-Craft charges that Kelly's Schedule 14B was untrue because it stated that Kelly had already contributed $25,000 to the Committee by September 23 when in fact no money was contributed until December. (PX 20). The Court finds that Kelly's contribution was not made until December so that his 14B was false and misleading in this respect. (Tr. 1105).

■ Chris-Craft additionally charges that Kelly's Schedule 14B failed to reveal that the $25,000 was secretly contributed by Cooper, so that it was untrue for Kelly's Schedule 14B to state that the contribution was made by Kelly. Testimony indicated that the money was a loan to Kelly by Cooper which was to be repaid. (Tr. 1104–1105). Thus the Court regards the contribution as Kelly's since Item 4(d) of Schedule 14B only inquires as to the amount contributed and not as to the source of the donor's funds. Therefore there was no requirement that Kelly's Schedule 14B reveal that Cooper had loaned Kelly the money that Kelly contributed to the Committee.

(3) *Lichtman's 14B schedule.*

■ Outside of allegations of participation by Lichtman prior to September, which as previously discussed, do not fall into the category of participation in a proxy fight, the only other charge against Lichtman is that his Schedule 14B falsely stated his participation began as of November 30 when prior to that time he had called shareholders to solicit their votes while attending a meeting in Cohen's office in early November. (PX 21). While testimony indicated that Lichtman did call Chris-Craft shareholders at that meeting (Tr. 1087, 3118), no proof was offered that they were called for any other reason than to verify that the shareholder list supplied by Chris-Craft was accurate. Merely placing calls for this purpose does not fit within any of the definitions of participant in Rule 14a–11(b).

While Lichtman from the very beginning agitated for all kinds of change in Chris-Craft's management, it has not been proved that his activity rose to the level of participant prior to his filing a Schedule 14B in late November. Consequently his Schedule 14B was not false and misleading because it revealed he became a participant on November 30, 1971.

### (4) *Porter's 14B schedule.*[17]

■ Chris-Craft contends that Harvey Porter, who ostensibly was acting only on his own behalf as a shareholder of Chris-Craft when he brought suit on September 3 in the Delaware Chancery Court to obtain a shareholder list, was in reality acting in concert with the Committee and was obtaining a shareholder list for their use. Chris-Craft alleges that this agreement occurred prior to the date of participation that he claimed in his Schedule 14B. (PX 23). The evidence indicates that Porter worked for Cohen's law firm (PX 23), that he had discussed the possibility of a proxy fight with Cohen in August (Tr. 1546–1547, 1551–1552), and that his holdings in Chris-Craft were relatively small and recently obtained. (PX 23). However, it has also been testified to that Cohen merely *hoped* Porter would provide the Committee with a shareholder list if he were successful. (Tr. 386–387). Moreover, Schnell indicated that he considered Porter's action to be independent of the Committee's. (Tr. 3150). Therefore, the Court finds that Chris-Craft has not proved by a preponderance of the evidence that Porter was acting in concert with the Committee, and his statement in his Schedule 14B that he became a participant on October 27 was not false and misleading.

### E. *The Committee's Proxy Material.*

■ Chris-Craft charges the Committee itself with several violations of .

the proxy rules. It charges that the Committee's estimate of $175,000 as the cost it would seek to be reimbursed if successful in the proxy contest was false and misleading because that sum was almost the bottom of the cost estimate that Reed had given the Committee. (PX 8). Reed had suggested a cost estimate of from $150,000 to $400,000. (Tr. 440). The Committee had a duty to reveal to shareholders the ultimate cost for which they would seek reimbursement and not merely to give shareholders the lowest estimate.[18] (PX 8). The defendants contend that Schedule 14A, Item 3(b)(4), 17 CFR § 240.14a–101, which requires a statement to the shareholders of the total amount estimated to be spent, does not include litigation costs. However, the instructions following Item 3(b) state that expenditures within the meaning of Item 3 include attorney fees and litigation costs, indicating that the court costs involved herein were properly to be included. Therefore the Committee's failure to make a more accurate estimate was in violation of Rule 14a–(3)(a).

■ In addition, the estimate may be false and misleading and in violation of Rule 14a–9. In order to find that Rule 14a–9 has been violated by false or misleading statements or omissions, the statements or omissions must be material. The Supreme Court in Mills v. Electric Auto-Lite Co., 396 U.S. 375, 384, 90 S.Ct. 616, 621, 24 L.Ed.2d 593 (1970) stated:

"[The determination that a misstatement or omission is material] indubitably embodies a conclusion that the defect was of such a character that it might have been considered important by a reasonable shareholder who was in the process of deciding how to vote. This requirement that the defect have a significant *propensity* to affect the voting process is found in the express terms of Rule

---

17. Although Porter was granted a trial severance, his possible false 14B schedule must be considered for the same reasons expressed in Footnote 8.

18. In this suit the Committee's counterclaim seeks a judgment of $498,379.44.

14a–9, and it adequately serves the purpose of insuring that a cause of action cannot be established by proof of a defect so trivial, or so unrelated to the transaction for which approval is sought, that correction of the defect or imposition of liability would not further the interests protected by § 14(a)." (Footnote omitted; emphasis in original). See also Gould v. American Hawaiian Steamship Co., 319 F. Supp. 795, 802 (D.Del.1970); Dillon v. Berg, 326 F.Supp. 1214, 1233 (D. Del.1971), aff'd 453 F.2d 876 (C.A.3, 1971).

■ Applying this standard to the proxy fight cost estimate, it is obvious that the low estimate of reimbursement might well have induced some shareholders to vote for the Committee's nominees. Had they been aware that the reimbursement sought by the Committee over and above the amount the corporation had already spent in support of management would be close to a half million, they might have voted quite differently. Therefore the low estimate was a material misstatement in violation of Rule 14a–9.

■ Chris-Craft also contends that the proxy materials disseminated by the Committee were false and misleading since they failed to reveal that, because of Chris-Craft's ownership of television and radio stations, FCC approval would be needed before a transfer of control could be effected and, in addition, that the approval would not likely be forthcoming in view of the unsavory backgrounds of Cohen and Kelly. The Chris-Craft charges are only partly correct, because the Committee informed the shareholders of the FCC requirements in December shortly after it became aware they existed. (PX 12). Nor was there any danger that the license transfer would be hindered by Cohen's background. Cohen had previously invoked the Fifth Amendment at a hearing into Teamster Union activities in 1961, but there were never any charges filed against Cohen nor even an investigation made. However, Kelly had been involved with bad check charges in North Carolina and Arizona, had been charged as a fugitive from justice in Wichita, Kansas, and had a purported drunken driving conviction in California. There would be a real possibility that the FCC would revoke Chris-Craft's television license if one of the new Board members had such a record. This information directly affecting a profitable asset would have a significant propensity to affect a shareholder's vote. Thus, the failure to so inform the shareholders was a material omission violative of Rule 14a–9. *Mills, supra.*

■ Chris-Craft contends that the Committee violated Rule 14a–6 by distributing an affidavit to shareholders in which Isador Seidler stated his personal belief that Kelly was a man of character, without a prior filing of the document with the SEC. (PX 10c). The Court finds that no prior filing was made with the SEC as required by the Rule. The Committee's failure to do so constituted a violation of Rule 14a–6.

### F. *Joint and Several Liability.*

Chris-Craft further contends that each member of the Committee, as well as the other defendants, is jointly and severally liable for each individual proxy violation.

### (1) *The Committee members' liability.*

■■ Besides being liable for the Committee's dissemination of false proxy material, each of the Committee members are also charged with liability for Gale's undisclosed participation and for Cohen's omission of a statement regarding purchase and sale of securities on his Schedule 14B. All of the Committee members attended the meeting at which Gale was active and are thus charged with notice that this activity would likely confer on him the status of participant, requiring the filing of a Schedule 14B. With regard to Cohen's purchase and sale of debentures which yielded a profit in excess of $50,000, some sort of inquiry should have been made by the Committee as to the nature

of the stockholdings of each participant. As for Bartling's and Archer Co.'s contribution, the Committee had an obligation to determine when the activities of its supporters rose to the level of participation. The Committee, ostensibly at least, was leading the proxy contest and had a duty to take affirmative action to assure that it was conducted without violating the SEC Rules. As Chief Judge Wright of this Court stated recently in Gould v. American Hawaiian Steamship Co., 351 F.Supp. 853 (D.Del.1972), "an individual who participates in a solicitation which utilizes materially false or misleading statements is liable if he knew or should have known that the statements were false or misleading." Under this standard, the Committee members are liable for the omissions of Cohen, Gale, Bartling, and Archer Co.

However, under the same standard, the Committee members are not liable for Cooper's undisclosed participation in advancing money to Kelly to finance the proxy battle, nor is it liable for Kelly's false statement in his Schedule 14B as to a contribution of $25,000 in October. On both of these occasions, Reed actively concealed Kelly's conduct from the rest of the Committee. (Tr. 655). Due to the active concealment, the Committee cannot be regarded as negligent in having failed to uncover these activities. The participants are not held to a standard of strict liability. Gould, supra, at 865, and thus the actions of Kelly and Cooper, which were actively concealed from the rest of the Committee, will not be imputed to the Committee.

(2) *The imputed liability of the "outsider" director-nominees.*

Six of the director-nominees were not members of the Committee. These include Duggan, Duke, Bates, Thorp, Pollin and Benitez. The position these nominees take is that their obligation was fully discharged by making accurate and complete filings with the SEC regarding themselves, and by not taking part in any misconduct charged against the others. They maintain any stricter standard would be inappropriate because of the lack of any real influence that outside director-nominees had over the conduct of the proxy battle and because the pressures of time and distance in the midst of a proxy battle made direct supervision impossible. While undoubtedly these are relevant considerations, a director-nominee does have some duty to determine for himself the validity of the proxy materials submitted. These nominees held out their names and reputations to shareholders as evidence that the group backing them was the proper choice to run the corporation. Having put their reputations in issue, the nominees cannot divorce themselves from improper actions taken in the proxy battle by the participants acting under the banner of their names. Moreover, since the major object of the proxy contest was to install the nominees into positions where they would ostensibly control the corporation, all participants working for their election are in a sense agents of the nominees, and thus the nominees must be expected to assume some responsibility for the actions of their agents. Nor is the standard impossible to meet in view of the considerations mentioned above. As Chief Judge Wright noted in *Gould*, "While the negligence standard does not make impermissible any reliance on expertise of legal or financial counsel in areas pertinent to their respective expertise, it does preclude directors from failing to read proxy statements to correct statements and facts which they knew or should have known were erroneous or misleading." *Id.* at 865. While in *Gould* the Court was dealing with incumbent directors, the same principles apply to director-nominees. The nominees are not held liable for every incorrect statement made in the proxy battle. However, in the instant situation the nominees were present at a December 4, 1971 meeting in which it was revealed that a complaint had been filed against them. (Tr. 627, 647). Among the allegations contained in that complaint were

that Gale was an undisclosed participant (Compl. ¶ 28(d)), that Cohen had made misstatements on his Schedule 14B (Compl. ¶ 28(b)) and that transfer of Chris-Craft's broadcast business would be in jeopardy because of Kelly's prior record. (Compl. ¶ 36). The nominees were thus confronted with specific allegations of wrongdoing on the part of several of the participants. They had a duty to attempt some kind of verification of the charges over and above merely relying on the self-serving assurances by those implicated that the allegations were untrue. No pressure of time and distance can be said to relieve the nominees of at least this duty. Nor are the nominees powerless to influence a change of conduct. If an independent investigation had revealed that there was substance to the allegations, if nothing else the nominees could have presented the Committee with the option of correcting the violations or facing their resignation as director-nominees. Failure to resign after such requested corrections were refused would amount to tacit assent to a continuance of the violation. Only resignation under such circumstances would suffice to purge the nominees of liability for the violation. Thus under the circumstances of this case, where the nominees were presented with specific allegations of wrongdoing on the part of their fellow participants, they had a duty to attempt to make an independent verification of the allegations and if substantiated, to demand corrective action and to resign if the action was not taken. Their failure to make an independent verification amounts to a breach of their duty to determine if the statements were false and misleading, and they are therefore liable for the proxy violations of which they were put on notice. *Gould, supra.*

*(3) Lichtman's imputed liability.*

■ While Lichtman was a minor character, he had a duty to determine the validity of the proxy materials disseminated. Although the standard of care applicable to him may not be as high as that of the members of the Committee, he was present at the December 4 meeting, was aware of the allegations in the complaint filed by Chris-Craft against him, and at least had a duty to attempt to make an independent verification of the specific charges alleged rather than rely on the self-serving declarations of those implicated. (Tr. 627, 647). *Gould, supra.* Upon learning that the allegations were true, he could have withdrawn from participation and relieved himself of liability. His failure to so act renders him liable for the violations of which he thus received notice.

## II. THE COMMITTEE'S COUNTER-CLAIM.

The Committee contends that Chris-Craft made numerous misleading statements in the proxy materials which it disseminated.

However, before proceeding to the merits of the counterclaim, it is necessary to resolve the question whether Cohen and the other defendants who were in privity with him, are barred from questioning the propriety of the transactions undertaken by Chris-Craft's management in which Cohen had previously served as Chris-Craft's attorney.

Canon 4 of the Code of Professional Responsibility of the American Bar Association provides that "a lawyer should preserve the confidences and secrets of a client." [19] The predecessors [20] to this

---

19. Cohen, as a member of the Pennsylvania bar, is governed by Pennsylvania Civil Procedure Rule 205, 12 P.S. Appendix, which provides that the existent Canons of Ethics of the American Bar Association shall be the standard for members of the bar of Pennsylvania.

20. The predecessor Canons read as follows: "6. Adverse Influences and Conflicting Interests.

The obligation to represent the client with undivided fidelity and not to divulge his secrets or confidences forbids also the subsequent acceptance of retainers or employment from others in matters adverse-

Canon have been interpreted to mean that once the former client demonstrates that the matters embraced within the pending suit are substantially related to the matters in which the attorney previously represented him, the attorney will be legally incapacitated to bring the suit. T. C. Theatre Corp. v. Warner Bros. Pictures, Inc., 113 F.Supp. 265, 268 (S.D.N.Y.1953). Once a substantial connection is established, it is presumed that the attorney was the recipient of confidential information. *Id.* at 268. See also Richardson v. Hamilton International Corp., 333 F.Supp. 1049 (E.D. Pa.1971).

The dispositive issue becomes whether in Cohen's previous role as attorney for Chris-Craft he acted in matters bearing a substantial relationship to the issues in the instant case. As previously noted, Cohen acted as attorney for Chris-Craft in expediting the registration of Piper stock before the Pennsylvania Securities Commission, and also attempted to engineer a settlement in the litigation involving the Colonial Realty merger. Although the Piper acquisition and the Colonial Realty settlement were among the management actions attacked in the counterclaim, the plaintiffs have not established "a substantial relationship" between the actions attacked here and the services previously performed for them by Cohen. With regard to the Piper stock, Cohen testified that his role was limited to making a telephone call to an acquaintance on the Pennsylvania Securities Commission. (Tr. 1377). With respect to the Colonial Realty merger, Cohen testified that his role was limited to calling a lawyer acquaintance who had a derivative suit opposing the merger to induce him to settle the suit. (Tr.

1404). Other testimony indicated that Cohen also reviewed a brief. (Tr. 3142).

Lending credibility to his testimony is the fact that Cohen lacked expertise in Securities matters. The Court believes that Chris-Craft would not have engaged Cohen to perform any more than the limited task of using personal connections as Cohen admitted performing. These limited roles as a go-between do not appear to bear a substantial relationship to the issues raised in the counterclaim as to the wisdom of the above transactions. Therefore there is no legal impediment to Cohen's asserting issues attacking the two transactions in this counterclaim.

The Court will now address itself to each alleged violation by management asserted in the Committee's counterclaim.

**A.** *Management's Claim That Chris-Craft's Total Assets Were $144,000,-000.*

The Committee contends that the asset value stated by management in its December 14, 1971 letter (CCX 1) was false and misleading because the figure includes the historical cost paid for stock in Piper Corporation, which should be carried at a value of $41,000,000 below historical cost. The evidence shows that Chris-Craft apparently attempted to buy a controlling interest in Piper Corporation, and in its attempt, paid a higher price for the stock than its then normal trading value. (CCX 7). The attempt to gain control failed and a competing company, Bangor Punta Corporation ("Bangor Punta"), actually ended up with controlling interest. (CCX 7). In litigation with Ban-

---

ly affecting any interest of the client with respect to which confidence has been reposed."

"37. Confidences of a Client.

It is the duty of a lawyer to preserve his client's confidences. This duty outlasts the lawyer's employment, and extends as well to his employees; and neither of them should accept employment which involves or may involve the disclosure or use

of these confidences, either for the private advantage of the lawyer or his employees or to the disadvantage of the client, without his knowledge or consent, and even though there are other available sources of such information. A lawyer should not continue employment when he discovers that this obligation prevents the performance of his full duty to his former or to his new client."

gor Punta over control in the Southern District of New York, Chris-Craft took the position that it was forced to pay artificially inflated prices for the stock because of unlawful activities of Bangor Punta. Chris-Craft Industries, Inc. v. Piper Aircraft Corporation, 337 F.Supp. 1128 (S.D.N.Y., 1971). Chris-Craft paid an average of $65 per share. (CCX 7). Since then in sporadic trading on a regional stock exchange,[21] the stock has traded in the low twenties. (CCX 18). In addition, Piper had had development problems with two of its projected new planes, and had had a substantial drop off in total sales and profits in the two years in which Bangor Punta had been in control. (CCX 5–6). On the other hand, Piper had issued a favorable earnings chart for the forthcoming year, and it remained an ongoing company. (PX 118). Furthermore, the drop-off in stock earnings occurred in a period when most stock values were down, especially for luxury items such as private airplanes. Both sides presented expert witnesses who testified that according to standard accounting principles, an investment in another corporation should not be carried at historical costs if there has been a permanent impairment in the value of the investment. The experts disagree whether, under the circumstances of the instant case, the facts indicated that there had been a permanent impairment in the value of Chris-Craft's investment in Piper. The Court takes no position on whether management was justified at valuing the Piper stock at its historical cost for accounting purposes. However, with regard to proxy solicitation materials, the fight for control, the losses Piper had suffered, its product development problems, its low trading price—all of these were material facts which should have been explained in conjunction with the carrying value, so that the shareholders could make their own decisions

with regard to the value. A shareholder aware of the above facts could reach a conclusion that the incumbent management had made a colossal misjudgment in acquiring the Piper stock in an attempted take over and obviously this conclusion would have had a significant propensity to affect his vote. Consequently, failure to set forth the above facts was a material omission violative of Rule 14a–9. Mills, supra. Management asserts that even if the problems of the Piper investment were material, the problem had been adequately disclosed to shareholders in footnote 3 of the Annual Report (CCX 2), which revealed the Bangor Punta litigation. Chris-Craft thus argued that it was unnecessary to go over that point again in the proxy solicitation materials. The Court rejects this contention. Even if a shareholder were astute enough to compare the December 14, 1971 letter, which only indicated total assets of 144 million, with footnote 3 in the Annual Report, the Report failed to disclose all of Chris-Craft's problems with Piper. For example, the Report nowhere dealt with the Piper product problems. In any case, the proxy rules are concerned with the manner of presentation of data within the proxy materials themselves. The proxy material must clearly refer to outside material before the outside material can be incorporated as containing the data required. Kohn v. American Metal Climax, Inc., 458 F.2d 255, 265 (C.A.3, 1972). Since there was no clear reference to the Annual Report in the proxy materials, its contents cannot be considered as alleviating any defect in the proxy materials. Since the information regarding the total asset value of Chris-Craft, including its principal investment in Piper Corporation, was essential to an informed decision by shareholders on the choice of a Board of Directors, its omission was a violation of Rule 14a–9. Mills, supra.

21. Because only 7% of Piper stock remained outstanding after Chris-Craft's battle for control with Bangor Punta, the stock was delisted from the New York Stock Exchange.

B. *Assertions That 1968 Was A Record Year For Chris-Craft.*

In its December 14 letter to shareholders, management also stated that 1968 and 1969 were record years for sales and earnings. (CCX 1). The Committee complains that this statement was deceptive because 1968 was not really a record year for earnings. In 1968, Chris-Craft had merged with Baldwin-Montrose Company and the combination in 1968 produced record earnings. It was on the basis of the earnings of the new consolidated company that 1968 produced record earnings. (Tr. 1342). The Committee claims that this is unfair and that, in comparing earnings, management should have treated Baldwin-Montrose as if it were a part of the company prior to 1968. The Court is unconvinced that management's characterization was improper. Since Chris-Craft to its credit did acquire a profitable asset during the year, it would only seem reasonable that it can rely on the profits from that asset in calculating its earnings for the year.

Even if the management claim were false, the Court finds that Chris-Craft could have made the statement that it had "record sales in 1968 and 1969 and record earnings in 1969" and this would not have been materially different to a shareholder than the statement actually made that "there were record sales and earnings in 1968 and 1969." Since the statement was not material under the *Mills'* test, there was no violation of Rule 14a–9.

C. *The Claim That Chris-Craft's Industrial Division Operated Profitably.*

In its December 14 letter to shareholders, management stated that the Industrial Division operated profitably in fiscal years 1970 and 1971. (CCX 1). The Committee attacks this statement as false and deceptive because the profit margin referred to was calculated before the allocation of corporate overhead costs of 1.8 million. (CCX 10). However, the Committee does not contest that overhead may be arbitrarily allocated. Thus even had management already allocated overhead, it could have allocated a small enough amount to the Industrial Division to insure that the Division showed a profit in those years. The Committee has not shown that the Division really suffered a "loss", and management's statement that the Division operated profitably has not been proved to be false.

D. *The Statement That The Turndown In Chris-Craft's Boat Sales Was A Result Of The Recession.*

In its December 14 letter, Chris-Craft further indicated to its shareholders that the decline in the national economy affected the sales of Chris-Craft boats. (CCX 1). The Committee contends that this statement was at variance with a statement made in a 10–K form filed by Chris-Craft with the SEC which indicated that the decline in boat sales was due to increased competition. (CCX 10). The Committee's position is that the December 14 letter is misleading because it gave the impression the turn down in sales would be reversed when the national economy recovered, when in reality the communication to the SEC indicated that the sales would continue to decline because of the increased competition. However, in its 10–K form to the SEC, management never stated that its percentage of total industry boat sales was declining. On the contrary, it stated that industry-wide statistics were unavailable. It only noted that its competition was now from companies with greater resources than the competitors it had in the past. (CCX 10, p. 2). It thus appears that the 10–K filing contained no statements inconsistent with the December 14 letter to shareholders. Furthermore, the December 14 letter did not state that the decline in boat sales was caused by the economic recession. It indicated that the recession was affecting boat sales, not that it was the sole reason for the decline. Consequently, the Court finds that the statement in the December 14 letter explaining the decline in boat sales was not false and misleading.

E. *The Claim That Sales Were Up 48% In The First Quarter Of Fiscal Year 1971.*

 The Committee contends that the statement by management in its letter of December 14 (CCX 1), that sales were up 48% from the first quarter of fiscal year 1971 was false and misleading because the increase in sales was a result of discounts, so that profit margins were not necessarily increased anywhere near 48%. The Committee further points out that in the 10–K form filed with the SEC (CCX 10, p. 2), Chris-Craft admitted that it used incentive programs to boost sales in normally off-peak months which would include the first quarter of the fiscal year. Standing alone this information does not prove that the profit rise was not as high as the sales rise. To take one example, there are year around fixed overhead costs that change little with volume; and there may be additional factors which in conjunction with fixed overhead could conceivably negate a reduction in profit caused by the discount offered. It cannot be said with any certainty based only on evidence of a discount that the profit increase is not at or near the level of the sales increase. Since the Committee has produced no other evidence to prove that the figures are at variance, the Court cannot conclude that such is the case, and declines to find that the statement was false and misleading.

F. *The Charge That Management Used Language In A Delaware Chancery Court Opinion In Its Favor, Which It Knew Had Been Reversed By The Delaware Supreme Court.*

 The Committee charges that management's quotation of Vice-Chancellor Marvel's opinion to shareholders in its December 2 letter (CCX 11) which stated that the Vice-Chancellor found "that there appears to be no fraud or inequity as such in the notice of the annual meeting of Chris-Craft or in the proxy form on which votes were solicited" was false and misleading because

the Delaware Supreme Court had since decided on appeal that Chris-Craft was guilty of inequitable practices. Schnell v. Chris-Craft Industries, Inc., 285 A.2d 437 (Del.Supr.1971). This characterization is simply wrong on its facts. The language cited by Chris-Craft was taken from Vice-Chancellor Marvel's opinion subsequent to and implementing the Supreme Court's opinion. Apparently the Vice-Chancellor interpreted the Supreme Court's opinion, as this Court also interprets it, to hold only that under the circumstances it was inequitable to attempt to move the meeting date to an earlier date, since the effect would be to curtail the defendants' opportunity to solicit proxies which, of course, was geared to the understanding that the meeting would be held on January 11, 1972. The Delaware Supreme Court did not hold that the notice of the meeting or the proxy forms themselves were fraudulent and inequitable, but only that the earlier meeting time chosen was improper. Management informed the shareholders of these facts, albeit in the light most favorable to themselves, and informed the shareholders that because there were no inequities in the notice of the meeting or the proxy forms, the proxies already solicited would not be invalidated. (CCX 11). Since this was substantially what the Vice-Chancellor stated in his November 30 opinion, management made no misstatement.

G. *The Statement By Management That, As Proof Of Their Confidence Management And Their Families Were The Owners Of 30,358 Shares Of Common Stock of Chris-Craft.*

 The Committee claims the above statement in management's December 14 letter to shareholders (CCX 1) was false and misleading because common stock had been purchased by management at a reduced rate and under a stock purchase plan and furthermore to have sold their shares would have involved forfeiture of some rights under the plan. Thus, it argued that neither buying or holding the shares was proof

of their confidence. In determining the validity of this charge, it would be relevant to consider the entire quotation. Management stated, "[y]our Board of Directors and management are convinced of the future of Chris-Craft. As proof of our confidence, we and our families are the owners of 30,358 shares of common and 268,881 shares of $1.40 convertible preferred stock and $6,200,500 Convertible Subordinated Debentures of your Company." Of the 30,358 shares referred to, 15,336 were purchased through the stock-option plan; of the 268,881 preferred shares, only 3,773 were purchased through the stock-option plan. (CCX 13). There was no plan for obtaining the debentures at a reduced rate through the company. The figures indicate that the shares obtained through the stock option plan were miniscule in proportion to management's total holdings. The Court finds that the information omitted would not be important to a shareholder, so there has been no violation of Rule 14a-9. *Mills, supra.*

**H.** *The Statement That Chris-Craft Had Settled The Colonial Realty Litigation By Agreeing To Issue 575,000 Seven-month Warrants To Purchase Chris-Craft Common Stock at $8.50 Per Share.*

 The Committee finally contends the above statement made in the November 8 letter to shareholders (CCX 13) was false and misleading because it failed to mention that Chris-Craft had the right to pay out $900,000 in lieu of these warrants. The Committee argued that the average shareholder had no idea of the value of the warrants. Management contends that the option was a mere upset price in the event the value of Chris-Craft common stock rose appreciably and did not determine any value. The Committee has provided no evidence to support its contention that the $900,000 option fixed the value of 575,000 seven-month warrants. More-over, even if it had, the Court does not believe that knowledge of this value would have had a material effect on any shareholder's vote in the proxy battle. The omission was not violative of Rule 14a-9. *Mills, supra.*

### III. QUESTION OF RELIEF.

Based on the defendant's proxy violations, Chris-Craft seeks (1) an injunction against the defendants' committing violations of Section 14(a) of the Act in the future, (2) reimbursement for the expenses of the proxy contest in the amount of $499,689 and (3) costs of this litigation including reasonable attorney fees. Likewise, the Committee by its counterclaim against Chris-Craft for its proxy violation seeks (1) reimbursement for the expenses of the proxy contest and the cost of this litigation including attorney fees in the amount of $498,379.44, (2) an order voiding the proxies used by Chris-Craft at the 1972 Annual Shareholders Meeting,[22] (3) an order voiding the election of directors at the 1972 Meeting, (4) an order requiring resolicitation of proxies and reconvening the 1972 Meeting, (5) an order requiring Chris-Craft to explain to stockholders that its proxy material violated 14(a) of the Act and (6) an order that new proxy solicitation materials comply with Section 14(a).

 Undoubtedly, the Court has the power to grant any and all relief necessary and appropriate to redress violations of Section 14(a) of the Act. *J. I. Case Co. v. Borak,* 377 U.S. 426, 84 S. Ct. 1555, 12 L.Ed.2d 423 (1969). In this case, however, the Court has found that in the hard-fought proxy contest both Chris-Craft and the Committee committed proxy violations. Ordinarily, where a party seeking equitable relief is itself guilty of a violation involving the transaction in litigation, equity decrees that relief be withheld under the doctrine

22. At an uncontested election at the 1973 Annual Meeting of shareholders held in early January, 1973, a new Board of Directors of Chris-Craft was elected.

of unclean hands. Root Refining Co. v. Universal Oil Products Co., 169 F.2d 514 (C.A.3, 1948); 2 Pomeroy, Equity Jurisprudence § 397. The doctrine is equally applicable to deny relief in a private suit for violation of SEC proxy rules where the party seeking relief was guilty of wrongdoing in a proxy contest. Gaudiosi v. Mellon, 269 F.2d 873 (C.A.3, 1959), cert. den. 361 U.S. 902, 80 S.Ct. 211, 4 L.Ed.2d 157 (1959); Kuehnert v. Texstar Corporation, 412 F. 2d 700 (C.A.5, 1969). When both parties seeking relief against each other are found guilty of violating federal securities law, the Court will leave the parties where they deliberately chose to place themselves.

■ The Committee urges that relief should not be denied to it because any violations on its part are outweighed by Chris-Craft's misconduct. But once it is discovered that parties are guilty of willful violations of federal law or other reprehensible conduct sufficient to bar equitable relief, it is not for the Court to weigh the illegality of the conduct where both parties are in *pari delicto*. Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 819, 65 S. Ct. 993, 89 L.Ed. 1381 (1945); Ohio Oil Co. v. Sharp, 135 F.2d 303, 307 (C.A.10, 1943).

■ Since both parties were guilty of illegal conduct in violation of the federal securities laws during a proxy contest, the Court will not lend its aid or grant the relief requested to either opposing party. Harriman v. Northern Securities Co., 197 U.S. 244, 296, 25 S. Ct. 493, 49 L.Ed. 739 (1905); Wheeler v. Sage, 68 U.S. (1 Wall.) 518, 530–531, 17 L.Ed. 646 (1863).

The above shall constitute the findings of fact and conclusions of law as required by Rule 52(a), F.R.Civ.P.

An order will be entered in accordance herewith.