D. Kimbrough **KING**, William A. Hanger, and John C. Jackson, both individually and on behalf and in the right of Peachtree Federal Savings and Loan Association, a federally-chartered mutual savings and loan association, Plaintiffs,

v.

David C. **EDWARDS**, George J. Cotsakis, Ben B. Blackburn, III, Thomas M. Lowe, Jr., Fred R. Tonney and the Peachtree Federal Savings and Loan Association, a federally-chartered mutual savings and loan association, Defendants.

Civ. A. No. C81–193A.

United States District Court,
N. D. Georgia,
Atlanta Division.

April 2, 1982.

Final Order May 3, 1982.

On Motion for Reconsideration
Oct. 1, 1982.

Richard Sinkfield, Allen Perry, Marvin Arrington, Atlanta, Ga., for plaintiffs.

Sidney Johnson, Thomas Jones, Atlanta, Ga., for defendants.

## MEMORANDUM OPINION

HORACE T. WARD, District Judge.

### I. *Introduction*

This matter arises out of a proxy contest in connection with the election of members of the Board of Directors at Peachtree Federal Savings and Loan Association ("Peachtree Federal" or "Association") in January of 1981. The plaintiffs are D. Kimbrough King, a member of the Board of Directors and former secretary of the Association, William A. Hanger, a former member of the Board of Directors of the Association,

and John C. Jackson, the former treasurer of the Association. Plaintiffs are suing individually and on behalf of Peachtree Federal. The original defendants were David C. Edwards, a member of the Board and the president of the Association, George J. Cotsakis, the chairman of the Board of Directors, and Peachtree Federal. The plaintiffs subsequently joined Ben B. Blackburn, III, Thomas M. Lowe, Jr., and Fred R. Tonney, all of whom were elected to the Board in the contested election. In essence, plaintiffs contend that the proxy solicitation materials employed by defendants Edwards and Cotsakis in the proxy contest were materially misleading in violation of the applicable proxy solicitation rules promulgated under relevant federal statutes. Plaintiffs also assert that defendants Edwards and Cotsakis breached their fiduciary duties to Peachtree Federal in connection with the contest. This court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331(a), 28 U.S.C. § 1337, and the doctrine of pendent jurisdiction. Defendants deny the basic allegations of the complaint and have asserted a counterclaim based on plaintiffs' initiation of the proxy contest. Further, defendants have raised several affirmative defenses to plaintiffs' claims. This matter was tried without a jury for seventeen (17) days during the period between November 30, 1981 and January 11, 1982, with supplemental written briefs being filed on February 1, 1982. The witnesses included experts for both sides, Federal Home Loan Bank Board ("FHLBB") officials, and present and former officers and directors of the Association. Extensive documentary evidence, including letters, minutes of Board meetings, and depositions, were introduced. This memorandum constitutes the court's findings of fact and conclusions of law.

## II. Findings of Facts and Conclusions of Law

### A. Factual Background

Peachtree Federal is a federally-chartered mutual savings and loan association founded in 1948. As such, the Association is subject to the supervision of the FHLBB. The principal office of Peachtree Federal is located at 3030 Peachtree Road, Atlanta, Georgia, and there are branch offices at various locations in the metropolitan Atlanta area. The evidence did not reveal any significant financial problems for Peachtree Federal until the middle 1970's, when the fortunes of the Association began to wane. The Association had been involved in several major real estate transactions, and consequently many of its problems coincided with the general economic decline of the real estate industry in the middle 1970's. Also, the Association had been involved in certain loan transactions that proved detrimental.[1] As a result of its problems, Peachtree Federal experienced net worth deficiencies which prompted the FHLBB to take affirmative steps in an attempt to return the Association to a stable financial position. These affirmative steps included subjecting the Association to a supervisory agreement which placed certain limitations on the operations of the Association.[2] At about the same time that the Association became subject to the supervisory agreement, the defendant David C. Edwards ("Edwards") was elected as the president and a member of the Board of Directors of the Association. Gradually over the next few years, the finances of the Association improved, leading to the release from the supervisory agreement in late 1979.

In the middle of 1980, problems arose between certain of the principals of the Association. These problems eventually re-

---

1. Some of the problem loans were loans secured by mobile homes in Florida which were purchased by the Association in the early 1970's. Beginning in 1973, it was discovered that many of the mobile home loans were inadequately secured or not secured at all. This led to the dismissal of the president of the Association in 1975, creating a vacancy to which Mr. Edwards was elected.

2. These restrictions included limitations on compensation to the management personnel of the Association and restrictions on the types of savings accounts which could be offered to the public.

sulted in the polarization of the Board, with Mr. King on one side and Mr. Edwards on the other. The parties disagree about the genesis of this dissension, and the evidence is not completely clear on this question. Plaintiffs assert that the dispute between Board members arose as a result of dissatisfaction with Edwards' performance as president. They contend that under Edwards' leadership, the Association had failed to keep pace with its competitors in offering a broad range of new services to the public, and argue that new management philosophies were needed at the Association in order to improve its financial condition. On the other hand, the defendants assert that Mr. Edwards had provided productive leadership, and had performed adequately in spite of adverse economic conditions in the industry. They further contend that while there were differences of philosophy among Board members, there did not exist an obvious split until a dispute arose concerning the legal fees of the general counsel of the Association, Mr. Alex McLennan. Mr. McLennan was the principal organizer of the Association. He served as a director and chairman of the Board from 1948 to 1977, and maintained substantial influence over the Association for many years. Two of the plaintiffs are related to Mr. McLennan by marriage, D. Kimbrough King (son-in-law) and William A. Hanger (brother-in-law).

It is clear that during the fall of 1980, Mr. King became convinced that Mr. Edwards should be replaced as president, and he informally sought the support of other Board members in this regard. However, the majority of the Board members backed Mr. Edwards. The problems among Board members escalated during the late fall of 1980, with two distinct factions eventually emerging. The schism between the groups crystallized with the resignation of two members of the Board. The then chairman of the Board, Mr. Harold Ivey, resigned in September, 1980, and Dr. Marvin Mitchell required in December, 1980. The circumstances surrounding these resignations will be more fully discussed below. The resignations left the Board deadlocked with re-

gard to major policy decisions, with Messrs. Edwards and Cotsakis (the new chairman) on one side and Messrs. King and Hanger on the other. This unsettled state of affairs led to a power struggle between the two factions from which the proxy contest and subsequent litigation ensued.

In December of 1980, it had apparently become obvious that a proxy contest was a distinct possibility. In view of this potentiality, each group took preparatory steps. By letter dated December 18, 1980, Mr. King sought access from the FHLBB to a list of the members of the Association for purposes of soliciting their proxies. In a letter dated December 19, 1980 to Mr. King, and a letter dated December 23, 1980 to Mr. Edwards' attorney, a supervisory agent of the FHLBB granted access to the membership list of the Association. As conditions of its approval of access to the membership list, the FHLBB required the parties to submit their respective solicitation materials to the FHLBB for prior approval, and required each side to bear its own expenses. By late December, the solicitation materials of both factions had been submitted to the FHLBB, and changes required by the agency had been effected.

It was the feeling of the FHLBB that a proxy contest would not be in the best interest of the Association, and the agency endeavored to prod the respective factions toward compromise. Despite the efforts of the FHLBB, no settlement of the matter was reached. In a final effort to forestall the proxy contest, the FHLBB "withdrew its consent" to the commencement of the proxy solicitation contest. Based upon the belief that the FHLBB did not have authority to prohibit the proxy solicitations, the King faction proceeded to mail its proxy solicitation materials on January 6, 1981. With the authorization of the FHLBB, the Edwards materials were mailed the following day. The FHLBB subsequently "authorized" the Edwards group to reimburse itself for expenses incurred as a result to the proxy contest. A proxy contest agreement was entered into between the parties on January 15, 1981. This agreement purport-

ed to govern the conduct of the annual meeting of the Association for which the proxies were being solicited, and to govern the tabulation of the proxies. Pursuant to this agreement, the accounting firm of Peat, Marwick, Mitchell & Co. was selected as the inspectors of election. The annual meeting of the Association was held on January 21, 1981. At this meeting, votes of the members (including the proxies) were cast for the election of directors.[3]

In late January, prior to the tabulation of the votes cast at the annual meeting, plaintiffs instituted this action. Plaintiffs contended that the proxy materials of the Edwards group had been materially misleading in violation of the relevant federal regulations. Plaintiffs sought an injunction halting the tabulation of votes, asserting that a continuation of the count would be unnecessarily expensive in view of the fact that the election was tainted. This court found that any harm caused by the allegedly tainted election was not irreparable, and did not outweigh the possible harm to the Association that could be caused by an injunction. Accordingly, the court denied plaintiffs' request for injunctive relief. After a tally of the votes cast at the annual meeting, it was determined that the Edwards group had prevailed in the proxy contest, and the slate of directors proposed by that group was elected. As a consequence of this election, plaintiff Hanger was ousted from the Board of Directors and the Edwards group took control of the Association.[4]

Plaintiffs proceeded with this action, continuing to maintain that the proxy solicitation materials of the Edwards faction were materially false and misleading. Specifical-ly, plaintiffs argue that the Edwards solicitation is materially misleading in that it conveys the impression that it is the official solicitation of the Association, implying approval by the Board of Directors. Plaintiffs contend that this impression is misleading because at the time of the proxy solicitation, neither group could represent itself as officially representing the Association. Both groups were composed of two directors, as well as key officers of the Association. Plaintiffs further seek relief for what they assert to be a breach of fiduciary duty by the Edwards group. Plaintiffs state that defendants Edwards and Cotsakis breached their fiduciary duty to the Association by causing the Association to reimburse the Edwards group for expenses incurred in connection with the proxy solicitation and this litigation without prior approval of the Board of Directors. As relief, plaintiffs are no longer seeking to have the court order a re-solicitation of proxies. Rather, plaintiffs suggest that more appropriate relief would be to restore the Board to its status quo prior to the proxy contest and for the court to fill the vacancies on the board from a slate of nominees proffered by the parties. With regard to the alleged breach of a fiduciary duty, plaintiffs seek to have the Edwards group to repay the Association the amounts paid from Association funds in connection with the proxy contest.

Defendants defend this action on several fronts. They argue that the Edwards materials are not materially misleading in view of the facts and circumstances of this case. They decry the application of cases arising under the federal securities laws regarding the misleading and material nature of proxy materials. Defendants assert

---

**3.** Four directors were to be elected at the annual meeting. Two directors were to be elected to fill vacancies created by the resignations of Ivey and Mitchell, and two directors were to be elected to fill other vacancies on the Board. The nominees of the King faction for the four Board seats were Taz L. Anderson, Thomas C. Bradbury, William A. Curry, and William A. Hanger. The ultimately prevailing nominees, those of the Edwards group, were Cotsakis, Fred R. Tonney, Ben B. Blackburn, III, and Thomas M. Lowe, Jr. The final talley of votes

was as follows: Edwards group–55,759 and King group–28,692.

**4.** The new Board of Directors replaced Mr. King as secretary, Mr. McLennan as general counsel, and Mr. Jackson as treasurer. The Board also ratified the payment of expenses incurred by the Edwards group in connection with the proxy contest. Further, the Board authorized funds to provide for the defense of this lawsuit.

that the standards under the regulations applicable to this case are different than those applicable to securities actions, and that their proxy materials were adequate under these different standards. Defendants also offer several affirmative defenses which they contend bar plaintiffs from prevailing. It is argued that plaintiffs have unclean hands in this action for equitable relief in view of several allegedly misleading aspects of plaintiffs own proxy solicitation materials. Defendants also assert that plaintiffs have no private right of action under the applicable regulations to bring this action. Other affirmative defenses include the doctrine of equitable estoppel and the doctrine of primary jurisdiction. Defendants have also filed a counterclaim against plaintiffs for losses incurred by the Association as a result of plaintiffs' initiation of the proxy contest. Specific findings relating to the above chronology of events will be discussed more fully in connection with the legal claims to which they relate.

### B. *Jurisdictional Defenses*

The court will initially address the defendants' contention that plaintiffs do not have a private right of action under the applicable regulations. Several courts have held that a private right of action exists for violations of the Home Owners' Loan Act of 1933 and the FHLBB's regulations promulgated thereunder. *E.g., Milberg v. Lawrence Cedarhurst Federal and Savings Loan Association*, 496 F.2d 523 (2d Cir. 1974); *Murphy v. Colonial Federal Savings and Loan Association*, 388 F.2d 609 (2d Cir. 1967). *See also Gibson v. First Federal Savings and Loan Association of Detroit*, 504 F.2d 826 (6th Cir. 1974); *City Federal Savings and Loan Association v. Crowley*, 393 F.Supp. 644 (E.D.Wis.1975). Defendants argue that the results in these cases would be changed by the recent Supreme Court decisions in *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), and *Touche Ross & Company v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). It is their position that these cases mandate the application of stricter standards for implied private rights of action under federal statutes.

In *Touche Ross & Company v. Redington, supra*, the Court held that there was no implied cause of action for damages under § 17(a) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78q(a). Section 17(a) requires certain broker-dealers to maintain such records and file such reports as prescribed by the Securities and Exchange Commission ("SEC"). The Court based its decision not to imply a private right of action on what it perceived to be the congressional intent. In divining the congressional intent, the Court noted that § 17(a) merely imposes a record-keeping and reporting requirement on the regulated businesses. The Court found that the purpose of these requirements is to assist the SEC in its regulatory functions and that a private right of action is not necessary to effectuate this purpose. The Court supported its decision by noting that certain provisions of the 1934 Act include explicit grants of private rights of action.

In *Transamerica Mortgage Advisors, Inc. ("TAMA") v. Lewis, supra*, the Court addressed the question of whether a private right of action existed under various provisions of the Investment Advisers Act of 1940, 15 U.S.C. § 80b–1 *et seq.* The Court held that § 215 of the Act, 15 U.S.C. § 80b–15, which declares certain kinds of contracts void, did create a limited right of action for purposes of rescinding such contracts or enjoining the operation of such contracts, and for restitution. Conversely, the Court held that § 206 of the Act, 15 U.S.C. § 80b–6, which proscribed certain kinds of conduct by investment advisors, did not create a private right of action for monetary damages. As in *Touche Ross*, the basis of the decision as to both provisions of the Investment Advisors Act was the Court's perception of congressional intent. After careful consideration, this court is of the opinion that the decisions in *Touche Ross* and *Transamerica* do not alter the result of prior cases holding that a private right of action exists under the Homeowner's Loan Act and regulations thereunder. The court concludes that the congressional

intent was to create a private right of action under this statute and its regulations.

By a 1974 amendment to § 12(i) of the 1934 Act, Congress directed the FHLBB to "issue substantially similar regulations to regulations and rules issued by the [Securities and Exchange Commission] . . ." for purposes of enforcing certain provisions of the 1934 Act, including the proxy solicitation provisions, against institutions insured by the Federal Savings and Loan Insurance Corporation ("FSLIC"). 15 U.S.C. § 78l(i). Pursuant thereto, the FHLBB promulgated 12 C.F.R. § 563d.1, which adopted certain SEC regulations, including the regulations regarding proxy solicitations, as the regulations of the FHLBB.[5] Thus, by virtue of the 1974 amendment to § 12(i) of the 1934 Act, Congress expressed its intent that federally insured savings and loan associations be governed in connection with proxy contests by rules similar to those applicable to proxy contests under the 1934 Act. At the time of the 1974 amendment, the Supreme Court had implied a private cause of action under § 14(a) of the 1934 Act and Rule 14a–9(a) promulgated thereunder, for improper proxy solicitations. *See Mills v. Electric Auto-Lite Company*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); *J. I. Case Company v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964).[6] It is a reasonable assumption that Congress was

aware that a private right of action existed under the SEC's proxy solicitation rules at the time it directed the FHLBB to promulgate similar rules. Accordingly, it is logical to assume that Congress intended a private right of action to exist under FHLBB rules.[7]

The court's conclusion that a private right of action exists under the Act and the regulations applicable to this case is buttressed by the fact that at least one of the decisions finding the existence of the private right of action prior to the recent Supreme Court cases did, indeed, allude to congressional intent. In *Murphy v. Colonial Federal Savings and Loan Association, supra*, Judge Friendly rejected an argument that the vesting of powers in the FHLBB regarding enforcement of certain provisions of the Act precluded court action by parties attempting to enforce those same provisions. In rejecting this argument, Judge Friendly stated in a footnote that "It seems much more likely that Congress intended parties to be able to pursue their ordinary remedies in the courts, . . ." rather than bring an action against the FHLBB. 388 F.2d at 613, n.5. Similarly, this court concludes that it is likely that Congress intended parties to be able to pursue ordinary court remedies to redress the violations of the rules governing proxy solicitations promulgated by the FHLBB.[8]

5. A technical reading of 12 C.F.R. § 563d.1 would appear to lead to the conclusion that Rule 14a–9, promulgated by the SEC to regulate proxy solicitations under the 1934 Act, is applicable to this proxy contest. However, as plaintiffs have not based their claims on Rule 14a–9, the court will not address that question.

6. Although recent cases may have limited the reasoning of these cases with regard to private damage action, the cases have not been overruled. Moreover, the case at bar involves equitable relief as opposed to damages. The existence of a private right of action for equitable relief is arguably governed by different standards than one for damages. *See Transamerica Mortgage Advisors, Inc. v. Lewis, supra.*

7. It is of no moment that the rules at issue in this case were not promulgated under § 12(i) of the 1934 Act. The indication of congressional intent in the 1974 amendment is still persuasive. It is presumed that Congress' intent regarding the standards applicable to proxy

contests for savings and loan associations would be the same regardless of the statute under which the applicable rules were promulgated. That intent is apparently expressed in the 1974 amendment to § 12(i).

8. This holding is not inconsistent with the Supreme Court's holding in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). In that case, the Court delineated four factors to be considered in determining the existence of an implied private right of action. Those factors are: (1) whether plaintiff is a member of the class for whose especial benefit the statute was enacted; (2) whether there is an indication of a legislative intent regarding the private right of action; (3) whether a private action would be inconsistent with the underlying purpose of the Act; and (4) whether the cause of action is one judicially left to state law. All four factors are met in this case. 422 U.S. at 78, 95 S.Ct. at 2088. It is clear that the plaintiffs in this case, as members of the Association, are in that class

Congress apparently recognized that private actions would be brought under the Homeowners Loan Act. In § 5(d)(1) of the Act, Congress stated that the FHLBB would "be subject to suit (other than suits on claims for money damages) by any federal savings and loan association or director or officer thereof with respect to *any matter* under this section or other applicable law, or rules and regulations thereunder, . . . ." 12 U.S.C. § 1464(d)(1) (emphasis implied). This section apparently contemplates that private actions would be brought to effectuate the purposes of the Homeowners Loan Act. There is no indication that Congress did not envision private actions when the FHLBB is not a party.[9]

 It should be noted that the existence of a private right of action under a particular statute is determined primarily by analyzing the statute for purposes of determining congressional intent. *See Crane Co. v. Harsco Corp., supra.* Thus, such a determination can only be made on a statute-by-statute basis. A holding that Congress did not intend a private right of action under a particular statute does not necessarily mean

that such an action was not intended under an entirely dissimilar statute. For the reasons set forth above, the court concludes that plaintiffs have a private right of action to enforce alleged violations of the Homeowners Loan Act of 1933, and the regulations promulgated thereunder.

 Defendants also argue that this action is barred by the doctrine of primary jurisdiction. Generally, that doctrine requires the submission of an issue to the relevant federal agency for an administrative determination prior to seeking judicial relief. However, the court holds that that doctrine does not bar the instant action. All proxy solicitation materials were submitted to the FHLBB prior to being mailed out, and that agency had an opportunity to act on any violations contained therein. Thus, as the FHLBB did have an opportunity to act on the alleged violations, plaintiff's failure to resubmit their claims to the FHLBB is not a bar to this action. *See Milberg v. Lawrence Cedarhurst Federal Savings and Loan Association, supra; Murphy v. Colonial Federal Savings and Loan*

for whose benefit the Homeowners Loan Act was enacted and the regulations thereunder were promulgated. As indicated in the text, an indication of congressional intent was expressed in the 1974 amendment to § 12(i) of the 1934 Act. A private cause of action would be consistent with one of the legislative purposes, i.e., protecting the assets of members of the Association. *See City Federal Savings and Loan Association v. Crowley*, 393 F.Supp. at 653. Finally, there is nothing to suggest that an action for improper proxy solicitations is traditionally left to state law.

Moreover, the court's decision as to the existence of a private right of action in this case is not altered by the decision of the Fifth Circuit in *Till v. Unifirst Federal S&L Association*, 653 F.2d 152 (5th Cir. 1981), a case relied upon by defendants. In *Till*, the Court was faced with the question of whether a private right of action existed to redress violations of the National Flood Insurance Program, 42 U.S.C. §§ 4012a(b) and 4104a. The Court applied the factors delineated in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), and decided that no private right of action exists. *Till* is distinguishable from this case in two important respects. First of all, that case involved a claim for damages as opposed to equitable relief. Several courts have alluded to the difference between claims for damages and claims

for equitable relief in implying a private right of action. *See Crane Company v. Harsco Corp.*, 511 F.Supp. 294 (D.Del.1981); *Kirsch Company v. Bliss & Laughlin Industries, Inc.*, 495 F.Supp. 488 (W.D.Mich.1980). Secondly, *Till* involved a federal act, the National Flood Insurance Program, whose purpose was entirely different from the Act involved in the case sub judice. In *Till*, the Court found that the purpose of the flood insurance program was to protect the federal government from making continuously large outlays in federal disaster assistance as the result of floods. Conversely, it is clear that the Homeowners Loan Act and the regulations promulgated thereunder were designed in part to benefit those members of the public relying on the soundness of such institutions. Thus, *Till* is clearly distinguishable.

9. Note that it was necessary for Congress to explicitly state that the Board would be amenable to suit in order for the government to give its consent for purposes of the doctrine of immunity. It would not be necessary for Congress to do so with regard to suits between non-government parties. Hence, the fact that the quoted portion of § 5(d)(1) only refers to the Board being subject to suit does not mitigate against the conclusion that Congress contemplated other private actions.

*Association, supra; City Federal Savings and Loan Association v. Crowley, supra.* Having now determined that plaintiffs do have the right to bring a private cause of action to remedy the violations complained of in this action, the court will now address the merits of their case.

### C. *Proxy Materials of the Edwards Group*

■ Plaintiffs' primary claim in this action is that the materials used by the Edwards' group in connection with the solicitation of proxies were materially false and misleading in violation of applicable federal regulations. Specifically, plaintiffs seek relief under 12 C.F.R. § 545.28 and 12 C.F.R. § 569.4. 12 C.F.R. § 545.28 was promulgated by the FHLBB pursuant to the Federal Home Owners Loan Act of 1933, as amended, 12 U.S.C. § 1461 *et seq.* and reads in relevant part as follows:

(c) *Right of communication with other members.* A member of a federal mutual association has the right to communicate ... with other members of the association regarding any matter related to the association's affairs, except for improper communications as defined in paragraph (e) ...

. . . . .

(e) *Improper communications.* A communication is an "improper communication" if it contains material which (1) at the time and in the light of the circumstances under which it is made (i) is false or misleading with respect to any material fact or (ii) omits a material fact necessary to make the statements therein not false or misleading, or necessary to correct a statement in an earlier communication on the same subject which has become false or misleading.

12 C.F.R. § 569.4 was promulgated pursuant to the National Housing Act, 12 U.S.C. § 1701 *et seq.*[10] That regulation provides in part as follows:

No solicitation of a proxy shall be made by means of any statement, form of proxy, notice of meeting, or other communication, written or oral, which:

. . . . .

(c) (1) contains any statement that is false or misleading with respect to any material fact or (2) omits to state any material fact (i) necessary in order to make the statements therein not false or misleading or (ii) necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter that has subsequently become false or misleading.

In substance, both regulations prohibit the use of materially false or misleading information in proxy solicitations. Plaintiffs contend that these regulations were violated by the Edwards group in that their solicitation materials conveyed the impression that it was the official solicitation of Peachtree Federal. Plaintiffs argue that since the competing factions in the proxy contest were both composed of members of an equally divided Board of Directors, as well as officers of the Association, the materials of neither faction could be cast as the official solicitation of the Association. Plaintiffs assert that defendants' depiction of their materials as those of the Association influenced the voting decision of members of the Association, and tainted the election.

Defendants deny that their proxy materials were misleading. They assert that the central issue in the proxy contest was the relative merit of the management philoso-

**10.** This regulation was promulgated prior to the 1974 amendment to § 12(i) of the 1934 Act. However, this does not affect the court's conclusion regarding the existence of a private cause of action to enforce violations of this regulation. The fact that this regulation is almost identical in substance to the SEC rule governing proxy solicitations leads to an inference that it confers the same rights conferred by the SEC rule, including a private right of action. Moreover, it could be inferred that if the 1974 amendment indicated congressional intent regarding a private right of action, it is likely that the intent would be applicable to regulations governing the same matters which were promulgated prior to the 1974 amendment.

phies of the two groups, and that all information relevant to this issue was clearly and fairly set forth. Defendants also point to the fact that the proxy materials of the King group make several references to "management." It is defendants' position that their proxy materials are not false and misleading when considered in light of the surrounding facts and circumstances. Although defendants' argument is appealing, a close analysis leads to a contrary conclusion.

The 1971 decision in *Dillon v. Berg*, 326 F.Supp. 1214 (D.Del.), *aff'd* 453 F.2d 876 (3rd Cir. 1971), decided under Securities Exchange Act of 1934, is instructive. *Dillon* involved a proxy contest in which one of two competing factions represented itself as speaking for management. The Court held those representations to be misleading because less than a majority of the Board of Directors had approved the materials. The Court stated that "Representing the proxy materials as 'management' and designating [defendants' nominees to the board] as 'management' nominees amounted to misstatements ..." 326 F.Supp. at 1234. Based in part on these misleading statements, the Court set aside the proxy results and ordered a re-solicitation. The re-solicitation of proxies also resulted in litigation. *See National Home Products, Inc. v. Gray*, 416 F.Supp. 1293 (D.Del.1976). In the second case, the Court was faced, inter alia, with a contention that the proxy materials of one group were misleading because they gave an unwarranted connotation of managerial and judicial approval. The Court held that the subject proxy materials did convey a misimpression regarding managerial and judicial approval, and were thus misleading. The Court stated that under the circumstances of that case, "it was incumbent upon those issuing proxy materials ... to clearly and compactly disclose their identity ..." 416 F.Supp. at 1319.

After consideration of the evidence and the relevant law, the court concludes that the proxy solicitation materials employed by the Edwards group in this case were materially misleading. The general tenor of these materials clearly gave the impression that it was the official solicitation of the Association. The misleading nature of these materials is demonstrated by the title: "STATEMENT OF MANAGEMENT WITH RESPECT TO SOLICITATION OF PROXIES FOR 1981 ANNUAL MEETING." Further, the Edwards group describes its nominees to the Board as having been selected by "the nominating committee of the Board of Directors ...." The materials further state that "this statement is provided in connection with the management's request for proxies ...." Also, the statement declared that it was "the understanding of management that proxies ... are also being solicited by Mr. D. Kimbrough King." The conclusion that the above statements gave the impression that the Edwards materials were the official solicitation of the Association is inescapable. The tone of this proxy solicitation statement, particularly the constant reference to it being management's statement, would lead to the conclusion that it was the official solicitation of the Association as approved by the Board of Directors. As both factions were composed of an equal number of members of the Board of Directors, as well as officers of the Association, it is highly misleading for the materials of one group to be passed off as the official solicitation of the Association. At no point does the Edwards materials describe the equal division of the Board or the fact that the King faction also included certain officers and directors of the Association. The court thus concludes that the Edwards materials were false and misleading in violation of the applicable regulations.

■ The materiality of the misleading statements is clear. The leading case on this question is *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).[11] In that case, the

---

11. Both *Northway* and *Dillon* involved proxy solicitations under the federal securities laws. Defendants argue against the court relying on

cases decided under the securities laws as authority in this case. However, the court finds the cases under the federal securities laws to be

Supreme Court held that a fact was material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." 426 U.S. at 449, 96 S.Ct. at 2132. There is a substantial likelihood that a reasonable member of the Association would consider it important in deciding how to vote if he thought that his proxy was being solicited officially on behalf of the Association. Hence, the court concludes that the misleading aspect of the Edwards' materials meets the *Northway* test of materiality.

The court's decision is supported by the testimony of plaintiffs' expert, Mr. Oliver Lee. Mr. Lee, currently engaged in the private practice of law, was an attorney for the SEC for approximately six years. He performed a variety of services for the commission, including approximately one year as special counsel and legal assistant to one of the SEC commissioners. In rendering his opinion, Mr. Lee was asked to assume that neither faction had the authority to represent itself as the official soliciting agent of the Association. He opined that the Edwards materials appeared to be the official solicitation of the Association, and based on the above assumption, that they were materially false and misleading. Although the defendants question Mr. Lee's ability to render an opinion as to FHLBB regulations, the court finds his testimony to be probative.[12]

The court's conclusion is also supported by other testimony in the case. Mr. Benjamin Blackman, III, one of the newly elected directors, testified by deposition that the Edwards' materials appeared to be an official solicitation on behalf of the current management of Peachtree Federal. Similarly, Dr. David Rochester, an economist called as an expert witness by defendants, testified that the Edwards' materials were a solicitation on behalf of the Association. However, the supervisory agent of the FHLBB that participated in the review of the proxy solicitation materials testified that neither faction had the authority to represent its solicitation as being the board's official solicitation. This testimonial evidence clearly supports the court's conclusion.

### D. The Unauthorized Reimbursements

Plaintiffs also filed a claim against the Edwards' faction based on an alleged breach of fiduciary duty. It is asserted that defendants breached their fiduciary duties by requiring the Association to reimburse or directly pay their expenses incurred in connection with the proxy contest without proper authorization. Defendants admit that they caused the Association to pay the expenses of conducting their proxy solicitation before receiving Board authorization. However, defendants claim that the payment was justified in that it was authorized by the FHLBB and subsequently ratified by the Board of Directors. The court finds this argument unconvincing. The proxy solicitation by the Edwards' group was a personal effort as opposed to an effort on behalf of the Association. The solicitation was based on their desire to have their slate of candidates elected to the board of directors. Hence, the expenses of the solicitation were personal obligations of the solicitors, and not obligations of the Association. It is well settled that the funds of an entity cannot be used to satisfy personal obligations of an officer. *Garner v. First National City Bank*, 465 F.Supp. 372 (S.D.N.Y.1979); *Corbin v. Corbin*, 429 F.Supp. 276 (N.D.Ga.1977). It is no defense that the FHLBB authorized the payments, as there is no statutory or regulatory au-

clearly analogous to the case at bar. As there are few cases decided under the Federal Home Loan Bank Board regulations, the court finds the securities cases to be cogent authority.

**12.** Plaintiffs also attempt to rely on a study conducted by Dr. Carl Hoffman to support its conclusion as to the misleading nature of the Edwards material. In the study, Dr. Hoffman polled 42 persons who had been called for jury duty by the Fulton County courts during the week of November 16 as to certain matters regarding both sets of materials. Because of the small statistical sample involved in Dr. Hoffman's study, the court concludes that the results are entitled to little probative value. However, with regard to what little value they are entitled, the results support the contentions of plaintiffs.

88

thority for the FHLBB to authorize expenditures of Association funds in that manner. Moreover, the court is of the opinion that the subsequent ratification by the Board, which was based in part on the FHLBB authorization, would be ineffective to make those payments valid. For the foregoing reasons, the court concludes that the actions of Edwards and Cotsakis in causing the Association to pay their expenses incurred in connection with the proxy contest were not properly authorized. *See Moran v. Edson*, 493 F.2d 400 (3rd Cir. 1974).[13]

### E. *The Doctrine of Unclean Hands*

██ The court has determined in the preceding section that the Edwards proxy materials are in violation of applicable law. Now, the court must determine whether plaintiffs are guilty of unclean hands and, if so, whether it bars them from prevailing. It is generally recognized that when a party seeking equitable relief is itself guilty of a violation of law or general equitable principles, the doctrine of unclean hands allows the court to withhold relief to the extent it deems appropriate. The doctrine is applicable in a private lawsuit for the violation of proxy regulations where the party seeking relief is also guilty of wrongdoing in the proxy contest. *See, e.g., Chris-Craft Industries, Inc. v. Independent Stockholders Committee*, 354 F.Supp. 895 (D.Del.1973); *Gaudiosi v. Franklin*, 166 F.Supp. 353 (D.C. Pa.1958). This doctrine has been recognized and applied in the Fifth Circuit. *See Wolf v. Frank*, 477 F.2d 467 (5th Cir. 1973), *cert. denied*, 414 U.S. 975, 94 S.Ct. 287, 38 L.Ed.2d 218 (1973).

The defendants strongly argue that if the court were to apply a pure disclosure standard to the various proxy materials at issue in this case, the King materials would clearly be deficient. Defendants further assert that the King materials are in violation of FHLBB regulations in numerous significant

respects. Thus, the defendants assert, even if the Edwards' materials are found to be legally deficient, it would be clearly inequitable for the plaintiffs to prevail in this case. In response to this defense, the plaintiffs assert that the doctrine of unclean hands is clearly inapplicable to the facts of this case. The plaintiffs correctly point out that the defendants have the burden of proof as to the essential element of the unclean hands defense. In resolving this phase of the case the court will address two aspects of the unclean hands defense. First, the court will address the validity of the King proxy materials with regard to the claims of the defendants. Secondly, the court will address the propriety of conducting a proxy contest under the circumstances then existing.

### 1. *The King Proxy Materials*

The King proxy materials consisted of a printed document divided into two parts, an introductory statement consisting of two pages and a proxy statement comprising approximately four and one half pages. These materials indicated that three officers or directors of the association had formed a "Peachtree Federal Members Protective Committee" to solicit proxies for the upcoming annual meeting. It was stated that the committee consisted of William A. Hanger, a director of the Association, John C. Jackson, treasurer of the Association, and D. Kimbrough King, secretary and director of the Association.

In summary, the defendants contend that the King proxy materials violated applicable law and regulations in the following particulars: the violation of 12 C.F.R. § 569–2(c); misrepresentations regarding losses of the Association and the failure to disclose the supervisory agreement; the failure to disclose the McLennan relationship; the failure to disclose Mr. Bradbury's lack of consent to serve on the Board; the

---

**13.** The court has authority over this claim by virtue of the doctrine of pendent jurisdiction if it is deemed a state law question. Note, however, that there is authority for the proposition that internal management of a federal savings

and loan association is a matter of federal common law. *See City Federal Savings and Loan Association v. Crowley*, 393 F.Supp. 644 (E.D. Wis.1975).

failure to disclose the withdrawal of FHLBB's approval of King solicitation; the failure to disclose the intentions of the King group to discharge the chief loan officer; nondisclosure of the Home Federal Merger negotiations and the Peach State proposal; the failure to disclose the circumstances of the Ivy and Mitchell resignations; and the misleading character of the "suggestions" in the King materials.

Plaintiffs admit to two deficiencies in their proxy statement. The plaintiffs concede that they were technically in violation of 12 C.F.R. § 569.2(c), which mandates that the proxy be clearly labeled "Revocable Proxy" in boldface type. However, plaintiffs point out that their statement did contain language and details explaining the revocability of the proxy in the body of the materials. The general counsel of the FHLBB, in ruling on the matter, expressed the opinion that the omission of the words "revocable proxy" did not constitute a "material enough" omission to bar the materials. The plaintiffs also concede that Mr. Jackson had not officially held the title of treasurer of the Association since August of 1976, as indicated in the King proxy materials. The court concludes that while there might be some ambiguity relating to the period of Jackson's tenure as treasurer, any misleading communications resulting from this confusion would not be material. It is the court's opinion that neither of the above claimed violations would meet the *Northway* definition of materiality.

Defendants also assert that the King materials were materially misleading in that they contained misrepresentations regarding losses of the Association and failed to disclose the existence of the supervisory agreement. It is not disputed that one of the basic issues of the proxy contest was whether the Edwards' management policies and philosophies should be continued or whether the changes advocated by the King group should be adopted. The proposals of the King group included the firing of Mr. Edwards as president of the Association. The court concludes that the King materials may be fairly read to imply

that the Association had suffered losses during the years preceding the proxy contest and that such losses were mainly attributable to the poor management of Mr. Edwards as president. Such an implication is materially misleading. The misleading nature of the materials is compounded by the fact that the King materials failed to mention the FHLBB supervisory agreement under which the Association operated from the spring of 1975 through the first three months of fiscal year 1980.

In this connection, the following statements from pages one and two of the King introductory statement are noteworthy:

... [W]e believe better management could have improved your association's performance ...

... [M]anagement has not responded satisfactorily to the board's request for proposals;

[M]anagement policies *which produced losses in the protective environment of the past* would be worse in competitive markets of the future.

[W]hile we intend to preserve jobs of association employees, if we are successful, we intend to hire a new president for the association (emphasis supplied).

It is perhaps true that one or more of the above-quoted statements standing alone would be innocuous. However, when read together in the context of the King proxy materials, these statements and their resulting inferences are materially false and misleading. Since Mr. Edwards was not elected president until May of 1975, his management policies could not be solely responsible for losses for fiscal year 1975, as he was president for only the last four months of that fiscal year. In each of the next four consecutive fiscal years of the Association (1976, 1977, 1978 and 1979), the Association realized net profits. The Association did realize a loss for fiscal year 1980 which could be partially attributed to Mr. Edwards' management policies, but these losses could also be attributed to a general decline in the savings and loan industry. The King materials imply that the Association had been suffering a continuous series

of losses due to Edwards' management. This implication is simply not supported by the facts.

Moreover, the King materials failed to disclose information necessary to make the statements made not misleading. A very important disclosure item when discussing the losses of the Association is the fact that the Association was subjected to a supervisory agreement by the FHLBB from the spring of 1975 to the first three months of fiscal year 1980. The supervisory agreement was imposed due to losses which occurred prior to the time of Mr. Edwards' involvement as a member of the Board or as president of the Association, a fact that was not disclosed by the King materials. It is beyond debate that the imposition of a supervisory agreement is a drastic arrangement imposed upon an association when its net worth falls below regulatory levels. The supervisory agreement imposed on Peachtree Federal mandated substantial restrictions on the investment activities of the Association during a period of highly volatile market conditions, including escalating interest rates. The testimony of defendants' expert, Dr. Rochester, and the report of his company, Kaplan, Smith & Associates, Inc., reveals the significant influence of the supervisory agreement upon the Association's performance.[14] The following extract from this report is noteworthy:

> ... Peachtree Federal's performance was severely hampered by a supervisory agreement imposed upon the association about mid-1975 that constrained the ability of management to carry out its policies since policies of management had to be approved by the supervisory agent. The record shows that the constraints placed upon Peachtree Federal especially put it in a non-competitive position in raising funds through long-term certificates from about mid-1975 through much of 1978.

While there is room for differences of opinion as to the actual impact of the supervisory agreement on the Association's operation, the court concludes that it was a substantial factor in restricting management options and activities and thus hampered the performance of the Association during a substantial portion of the period to which the criticisms of the King materials are directed. In so ruling, the court is not concluding that the mere failure to mention the supervisory agreement in the King materials was a material omission standing alone. Rather, the failure to disclose the existence of the supervisory agreement, coupled with other representations as to the cause of losses constitutes a fatal defect and violates the FHLBB regulations cited above regarding communications with members and proxy solicitations.

Defendants also contend that it was materially misleading for plaintiffs not to disclose the relationship of Mr. Alex McLennan to the plaintiffs and to this litigation. As discussed above, Mr. McLennan was the principal organizer of the Association, and served as Chairman of its Board of Directors from 1948 through 1977. At the time of the proxy contest, he was serving as the Association's general counsel, from which he derived a substantial portion of his legal income. Defendants argue that from its inception, the Board of Directors of Peachtree Federal had been comprised largely of relatives and close business associates of Mr. McLennan. The evidence revealed that Mr. King is Mr. McLennan's son-in-law and that Mr. Hanger is Mr. McLennan's brother-in-law. The defendants point out that Mr. McLennan's interest in the proxy contest was confirmed by the fact that he made a loan of at least $50,000.00 to Mr. King to finance this litigation. Defendants assert that it would have been important for members of the Association to know the relationship of the King group to Mr. McLennan because of the fact that he derives a substantial portion of his income from the Association, and because of his past influence over the affairs of the

---

**14.** At the trial of this matter, plaintiffs objected to the admission into evidence of portions of the reports of Kaplan, Smith Associates, Inc. Although the court admitted the report, it did not rely on the portions to which plaintiffs objected.

Association. As pointed out in another section of this opinion, defendants strongly contend that the proxy contest was principally initiated because of a dispute between the Edwards' group and the King group over legal fees to be paid to Mr. McLennan.

The Edwards' proxy materials appear to imply that because of the relationship to Mr. McLennan, Mr. Hanger, and Mr. King, as well as their Board nominees, might be less than independent in exercising judgment in the conduct of the affairs of the Association. This implication is not borne out by the evidence. The nominees other than Hanger named in the King proxy materials, while friends or associates of Mr. King, were not relatives or business associates of Mr. McLennan. They were relatively young, engaged in various enterprises, and appeared to be of independent minds.

In view of the foregoing, the court concludes that the failure of the King materials to disclose the family relationship between Messrs. McLennan, King, and Hanger was not a material omission. It is clear that McLennan previously had substantial influence over the operations of the Association, and possessed a definite financial interest in the Association. There is no question that he has made numerous contributions to the development and success of Peachtree Federal. However, the evidence does not establish that the King group was merely the alter ego of Mr. McLennan, or that Mr. McLennan was in fact the principal unnamed moving force of the King group. Despite the defendants' suggestions throughout the course of the trial, the evidence presented is simply insufficient to support such a finding.

We now turn to defendants' contention that the failure of the King materials to disclose the withdrawal of FHLBB approval of the King proxy solicitation rendered the King materials false and materially misleading. In this connection, the defendants argue that any proxy contest was to be conducted on a contractual arrangement with the FHLBB which expressly provided for prior approval of proxy materials by the FHLBB. Mr. Zimmerman, a super-

visory agent of the FHLBB, testified that the intent of the agreement was to place the proxy contest under the control of the FHLBB. Accordingly, the solicitation of proxies by both groups was subject to conditions set forth in letters to Mr. King and to Mr. Edwards' attorney. In accordance with these letters, the proxy materials of both groups were submitted to FHLBB, were re-written to address concerns of such officials, and in effect, the materials of both groups were "approved" for submission to the members. The FHLBB subsequently came to the conclusion that a proxy contest was not in the best interest of Peachtree Federal or the savings and loan industry in general. Unfortunately, efforts to prevail upon the competing groups to compromise were not successful. Upon learning that the King group was determined to go forth with the proxy solicitation, a letter dated January 2, 1981 to Mr. King's attorney from Mr. Connell stated that "We are withdrawing our consent to your client's request to mail the prepared material."

While it clearly appears that the efforts and concern of the supervising agents in question were genuine and sincere, the court concludes that they were without legal authority to "withdraw their consent" to the mailing of proxy materials. Members of the Association, including Mr. King and Mr. Edwards, have the full right to communicate with fellow members of the Association, including the mailing out of proxy materials, as long as such communications are not improper. 12 C.F.R. § 545.28. The FHLBB does not have to consent to any such mailing. Since the withdrawal of consent was legally meaningless, there was no obligation to disclose it. For the foregoing reasons, the court concludes that the failure of the King group to disclose the withdrawal of approval by the FHLBB did not render the King materials materially false and misleading. The actions of the supervisory agents might be of significance, however, in dealing with the propriety of conducting a proxy contest (discussed below).

The court has considered the remaining contentions made by the defendants as to representations or omissions which render the King proxy materials false and misleading in various particulars. The court hereby concludes that none of the other assertions are sufficiently misleading or material to render the King materials in violation of applicable FHLBB regulations. However, some of these contentions may have significance to other matters covered in this opinion.

### 2. *Propriety of Conducting the Proxy Contest.*

 Throughout the litigation, the defendants have strongly argued that the proxy contest was initiated and maintained by the King group in disregard for the safety and soundness of Peachtree Federal. The defendants state that the deadlock on the Board of Directors was engineered by the plaintiffs by forcing directors they could not control off the Board (Ivey and Mitchell). Further, the defendants contend that the proxy contest was initiated in violation of the letter agreement with the FHLBB. Defendants also argue that as officers and directors of the Association, plaintiffs breached a fiduciary duty owed to the Association not to initiate an unauthorized or improper proxy contest with full knowledge that to do so would in all probability result in substantial savings outflows from the Association. Plaintiffs assert that they did not initiate the proxy contest. They state that the point which fixed the positions of the parties almost irreconcilably was on December 8, 1980, when the nominating committee appointed by Mr. Edwards made it clear that Mr. Hanger would not be renominated to the Board. It was allegedly unprecedented for a sitting director not to be renominated. Plaintiffs argue that this event, together with other differences, including the division over the retention of Mr. Edwards as President, left the two factions with the almost inevitable prospect of a proxy solicitation contest. The court is mindful that the position of the defendants regarding the propriety of the proxy contest are mainly set forth in the counterclaim, but the court feels that the subject matter is of such a nature as to be relevant to a consideration of whether the plaintiffs were guilty of unclean hands.

It is clear from the evidence that the resignations of Mr. Ivey in September, 1980, and Dr. Mitchell in December, 1980 reduced the membership on the Board of Directors of the Association to four, thereby resulting in a situation where a deadlock on major issues was likely. The court is of the opinion that only the resignation of Dr. Mitchell is directly relevant to a discussion of the propriety of the proxy contest.[15] The evidence indicates that Mr. King had diligently sought the support of Dr. Mitchell in his efforts to oust Mr. Edwards as President of the Association. However, Dr. Mitchell had declined, feeling that no justification had been shown for firing Mr. Edwards. On December 5, 1980, Mr. King visited Dr. Mitchell in his office and confronted him with an opinion from a lawyer stating that a particular out of state loan transaction was in violation of rules and policies of the Association, and that anyone connected with the transaction would be sued. Mr. King stated that the proposed suit would be dropped if Mr. Edwards was fired. Dr. Mitchell testified that while he did not feel threatened, the pressure placed on him to get rid of Mr. Edwards made him uncomfortable and the prospect of being involved in a lawsuit was enough for him to accept his son's advice to resign from the Board. Thus, on February 5, 1980 Dr. Mitchell submitted his letter of resignation to the Board. It further appears that on the same day, Mr. King confronted Mr. Cotsakis with the legal opinion concerning the loan trans-

---

**15.** Dr. Mitchell testified at both the hearing for temporary relief and at the trial. Mr. Ivey testified at the first hearing but not at trial. The defendants sought to offer the deposition of Mr. Ivey, but portions were objected to by plaintiffs. The court suspended use of the dep- ositions until the objections could be ruled on. The defendants did not reoffer the depositions, and counsel for defendants subsequently informed the court they would not insist upon using Mr. Ivey's deposition. Accordingly, the court did not rely on this deposition.

action, suggesting that he might be subject to a lawsuit because of his involvement with that transaction. Mr. King told Cotsakis that if he would vote to fire Mr. Edwards as President, the lawsuit would not be necessary. Cotsakis would not join the efforts to fire Mr. Edwards. Later, Mr. King presented the proposal to file suit regarding the subject transaction to the Board, and the vote on that proposition was predictably deadlocked.

While the evidence is insufficient to support the original position of the defendants that Mr. King confronted Dr. Mitchell in order to force him off the Board thereby creating a deadlock, it does establish that the confrontation prompted Dr. Mitchell to resign. With the resignation of Dr. Mitchell and the refusal of Mr. Cotsakis to join the effort to oust Mr. Edwards, the die was cast for the proxy contest on December 5, 1980. This series of events, more than any other single factor, led to the proxy solicitation contest in this case.

▉ The court has ruled above that the consent of the FHLBB was not necessary for the King group to communicate with the members of the Association. On the other hand, the failure of the King group to acquiesce in the FHLBB's request not to mail their proxy materials might be of significance in determining the propriety of continuing the proxy contest. It is clear that the Edwards group stood ready to postpone the proxy contest and to seek further compromises in early January of 1981. However, the King group rejected the compromise efforts and proceeded to mail their materials. In all fairness to the King group, the court recognizes that time was of the essence in that the bylaws of the Association provided that all proxies must have been received five days before the annual meeting at 4:00 p. m., January 21, 1981. All facts and circumstances considered, however, the court is of the opinion that postponement of the contest and a reasonable attempt to compromise was a viable alternative to conducting a proxy contest at the time, particularly in view of the financial condition of the Association. The court

does not conclude that the King group was in any way legally barred from commencing and continuing the proxy contest. To so rule would have the effect of holding that proxy contests might be legal during good economic times, but not during bad times. The court knows of no legal authorities supporting such a position. The court simply concludes that given the facts and circumstances of this case, the decision of the King group to go forward with the proxy contest over the objections of the relevant regulatory agency is a fact that bears on the court's determination of whether plaintiffs have clean hands for purposes of equity. In view of the foregoing findings regarding the King proxy materials, the circumstances leading to the proxy contest, and the propriety of the proxy contest, the court concludes that the plaintiffs are guilty of unclean hands.

### F. *Counterclaim*

▉ Defendants have filed a counterclaim seeking to recover damages resulting from plaintiffs' commencement of the proxy contest. In essence, defendants argue that plaintiffs instituted this action in violation of an agreement not to mail their proxy materials without FHLBB approval. Defendants further assert that plaintiffs breached their fiduciary duty to the Association by commencing the action with knowledge that it could cause substantial harm to the Association. Approximately four million dollars ($4,000,000.00) is sought as damages resulting from the proxy contest.

After due consideration, the court concludes that defendants cannot recover on their counterclaim. The evidence in the case will not support a conclusion that plaintiffs breached any agreement with the FHLBB by instituting the proxy solicitation. Also, the evidence will not support a finding that plaintiffs breached their fiduciary duty. Although the court has found above that plaintiffs were guilty of unclean hands partly because of the commencement of the proxy solicitation contest, the court does not conclude that this constituted a

breach of their fiduciary duty. Further, while the evidence is sufficient to show that there was some savings outflow resulting from the proxy contest, it is insufficient to show the exact amount. Any award of damages on this ground could only be based on speculation and conjecture, which is not allowed by the law.

### III. *Remedies*

It is generally well settled that federal courts may employ broad equitable powers in shaping appropriate relief. *E.g., Walters v. Marathon Oil Company*, 642 F.2d 1098 (7th Cir. 1981); *Sargent v. Genesco, Inc.*, 458 F.2d 9 (5th Cir. 1972). In a case involving the use of defective proxy statements, this would include the power to void an election and order a re-solicitation of proxies. *See Kennecott Copper Corporation v. Curtiss-Wright Corp.*, 584 F.2d 1195 (2nd Cir. 1978); *Plant Industries, Inc. v. Bregman*, 490 F.Supp. 265 (S.D.N.Y.1980). The court has found the proxy materials of both plaintiffs and defendants in the case sub judice to be defective. Under general principles of equity, including the "doctrine of unclean hands," it could be appropriate in some circumstances for a court to refuse to grant any relief if both parties are found to be guilty of wrongdoing. *See Chris-Craft Industries, Inc. v. Independent Stockholders Committee*, 354 F.Supp. 895 (D.Del.1973). However, equitable principles should not be applied when the result would be the frustration of the purposes of federal law. *See Mitchell Brothers Film Group v. Cinema Adult Theater*, 604 F.2d 852 (5th Cir. 1979) *cert. denied* 445 U.S. 917, 100 S.Ct. 1277, 63 L.Ed.2d 601; *Bertoglio v. Texas International Company*, 488 F.Supp. 630 (D.Del. 1980).

One of the obvious purposes of the proxy solicitation rules violated in this case is to allow the members of federal savings and loan associations to have the benefit of full and fair disclosure of all relevant information before making election decisions. A refusal to grant any relief would frustrate that purpose since the court has found both sets of proxy materials at issue to be defective. The best interests of the members of the Association would not be served by requiring them to continually live with the results of a tainted election. Accordingly, the court is of the opinion that the results of the election of directors at the annual meeting of Peachtree Federal in January of 1981 must be set aside.

The parties recognize, and the court agrees, that a re-solicitation of proxies would not be in the best interest of the Association at this time. Plaintiffs suggest that the court order the Board of Directors to be reconstituted as it existed prior to the January, 1981 election, and to appoint interim directors to serve until the 1983 annual meeting of the Board of Directors. The defendants will be given a reasonable period of time after the entry of this opinion to respond to plaintiffs' proposal and to proffer any suggestions as to how the Board of Directors should be constituted.

It is also necessary for the court to determine an appropriate remedy for the Association's improper payment of expenses associated with the proxy contest. Pursuant to the court's ruling above, Edwards and Cotsakis will clearly have to refund payments made by the Association for expenses of the proxy contest exclusive of expenses connected with the defense of this lawsuit. Defendants will be given a reasonable amount of time after the entry of this opinion to show cause why expenses paid by the Association in connection with the defense of this lawsuit should not be refunded. All other relief sought, including plaintiffs' request for expenses and attorneys' fees are hereby DENIED. An appropriate order will be entered in accordance with this opinion.

### FINAL ORDER

On April 2, 1982, the court entered a Memorandum Opinion in this case setting forth its findings of fact and conclusions of law. The court simultaneously entered an order directing the parties to submit additional written materials relating to the restructuring of the Board of Directors of Peachtree Federal and the question of whether defendants Cotsakis and Edwards

should be required to reimburse the Association for legal fees and expenses paid in defense of this lawsuit. The order also declared that the current members of the Board of Directors were to remain in office until further order of the court.

A. *Composition of the Board of Directors.*

Upon due consideration of the contentions presented by the parties, it is hereby ORDERED that the election of directors of Peachtree Federal conducted at the January, 1981, annual meeting be set aside. It is further ORDERED that as of May 10, 1982, the directors elected at the January, 1981, annual meeting be permanently ENJOINED from serving as directors of the Association. The court hereby appoints the following nine (9) people to serve as the Board of Directors of Peachtree Federal Savings and Loan Association: (1) the four members of the Board sitting prior to the annual meeting on January, 1981, namely, George Cotsakis, David Edwards, William Hanger, and D. Kimbrough King; (2) four additional members nominated by the parties (two by each side), namely, Thomas M. Lowe, Jr., John C. Jackson, Robert S. Prather, Jr., and Fred R. Tonney; and (3) George M. Parks selected by the court from a list of four names submitted by the parties. All of the nine members of the reconstituted Board of Directors of the Association shall serve a term of office from May 10, 1982, until their successors are chosen and installed. It is further ORDERED that the directors of the Association elected at the annual meeting in 1983 and thereafter be elected in accordance with the charter and bylaws of the Association.

The court further concludes that, except as set forth in the Memorandum Opinion and this order, all actions of the current members of the Board of Directors of the Association taken subsequent to the January 1981 annual meeting are valid, to the extent they are otherwise legally sufficient.

B. *Expenses of the Proxy Contest.*

In the Memorandum Opinion entered in this case, it was concluded that all monies paid by the Association for the expenses incurred by Edwards and Cotsakis in the proxy contest must be refunded to the Association. Based on the materials submitted in accordance with the court's directive, the court finds that the amount paid by the Association for expenses incurred by Edwards and Cotsakis in connection with the proxy contest is $17,386.58. This amount must be refunded to the Association.

C. *Expenses of this Litigation.*

The remaining issue before the court is whether defendants Cotsakis and Edwards should be required to repay to the Association all monies (or any part thereof) paid by the Association for legal fees and expenses incurred in connection with the defense of this lawsuit. This is a very hotly contested issue between the parties. Defendants argue that requiring these defendants to pay the legal costs and expenses of this action is totally without foundation in the evidence and would be grossly inequitable. They further argue that the Association was named as a defendant in the lawsuit and has a vital interest in defending the action; that any benefits flowing from the defense of the litigation flowed primarily to the Association; and that a portion of the fees and expenses was incurred in preparation of the Association's counterclaim. Further, defendants contend that based on the evidence before the court, it is not possible for the court to allot some of the expense of the litigation to the individual defendants and the remainder to the Association.

In response, plaintiffs argue that the defendants' position is totally without merit and that defendants Cotsakis and Edwards should be held responsible for all funds paid by the Association in the defense of the lawsuit. In support of their position, the plaintiffs argue that the individual defendants are guilty of a serious breach of fiduciary duty in causing the Association to pay for expenses of the proxy contest; that the defense of the lawsuit was primarily for the benefit of the individual defendants; and

that the court has found against the defendants on the counterclaim. Plaintiffs assert that the burden of proving allocation is upon the defendants. Further, they state that no allocation need be made for the unsuccessful prosecution of a meritless claim where the court has denied attorneys' fees to the plaintiffs for the successful prosecution of a meritorious claim.

Although it is a difficult decision, the court does not find plaintiffs' position convincing. Contrary to what plaintiffs' argument apparently suggests, there was no decisive winner in this lawsuit. While the court found the proxy materials of the Edwards group to be fatally defective, it also concluded that the individual plaintiffs were guilty of unclean hands in that their proxy materials were also defective, and because they unwisely commenced the proxy contest under the then existing circumstances.

Further, the effect of the denial of plaintiffs' request for injunctive relief was to give the then existing Board of Directors the authority to carry on the affairs of the Association pending final disposition of this action. The Board proceeded to appoint counsel for defendants as the Association's General Counsel, and authorized said counsel to take appropriate actions to defend this lawsuit and file a counterclaim. Unlike the reimbursement of expenses incurred in the proxy contest, the authorization to the General Counsel to defend this lawsuit was not based on the "authorization" letter from the Federal Home Loan Bank Board. Moreover, the Board authorized the defense of this lawsuit on behalf of the Association, whereas the expenses incurred in the proxy contest were strictly personal obligations on Edwards and Cotsakis. While the court does not purport to judge the wisdom of various Board actions, it recognizes that the Board could not very well ignore the pendency of a lawsuit in which the Association was a named defendant.[1] For the foregoing reasons, the court concludes that the

Association's payment of expenses incurred in connection with the defense of this lawsuit was properly authorized by the Board of Directors. The court is mindful of the fact that a portion of the defense of this action inurred to the benefit of the individual defendants. However, there is no legally sufficient basis upon which the court can reasonably allocate the legal expenses between the individual defendants and the Association. Accordingly, the Association's payment of legal expenses incurred in connection with the defense of this action will not be disturbed.

The clerk of the court is DIRECTED to enter a final judgment in this case in favor of the plaintiffs and against the defendants. Further, the clerk is DIRECTED to enter judgment in favor of Peachtree Federal Savings and Loan Association and against defendants Edwards and Cotsakis in the amount of $17,386.58. In view of the decision in the Memorandum Opinion, the parties are to bear their own costs, and the clerk is DIRECTED to tax accordingly.

Although a final judgment is to be entered as to all litigated issues and for all other purposes, the court retains jurisdiction over this matter for the sole purpose of dealing with any deadlock or vacancy that might occur on the Board of Directors of the Association prior to the annual meeting of 1983.

## ORDER ON MOTION FOR RECONSIDERATION

■ This case is currently before the court on plaintiffs' motion for reconsideration urging the court to modify the Memorandum Opinion entered April 2, 1982, and the Final Order dated May 3, 1982, so as to provide them an award of attorneys' fees and expenses of litigation. In support of their motion, the plaintiffs strongly argue that as a result of the prosecution of the complaint in this action, a substantial bene-

---

1. This matter is further complicated by the fact that the newly-elected directors were added as nominal defendants. Regardless of the appropriateness of adding them as defendants, it

cannot be seriously asserted that these defendants should have to pay for their defense out of their own pockets.

fit has been conferred on Peachtree Federal Savings and Loan Association ("Association"), and that under applicable federal law, they are entitled to reasonable attorneys' fees with respect to the success they achieved. Plaintiffs further assert that significant disparate treatment has been imposed on them when the success that they achieved in this action is compared to the results achieved by defendants. Of particular concern to plaintiffs is the fact that the individual defendants were not required to reimburse the Association for any attorneys' fees paid for defending the lawsuit. In response, the defendants urge the court to deny the motion for reconsideration in that it fails to raise any additional facts or legal authorities not fully considered by the court in connection with prior orders. Defendants further state that the plaintiffs' argument embodies fundamental misconceptions regarding prior orders of the court, particularly the court's finding that the plaintiffs were guilty of unclean hands in connection with the proxy contest. The defendants argue that whatever flowed to the Association as a result of the plaintiffs' efforts was more detrimental than beneficial.

Plaintiffs' motion for reconsideration requires the court to deal with an aspect of the litigation not adequately addressed in the memorandum opinion and the final order. In reaching its prior decision to deny plaintiffs' request for expenses and attorneys' fees, the court relied primarily upon its finding that plaintiffs were guilty of unclean hands in connection with the nature of their proxy materials and the impropriety of instigating the proxy contest. Further, this court specifically found that the evidence did not support a conclusion that the plaintiffs breached their fiduciary duty to the Association. Not specifically discussed or ruled upon in the memorandum opinion was the question of whether the efforts of the plaintiffs in prosecuting the lawsuit conferred any benefit upon the Association. Thus, the issue now before the court is whether a benefit was in fact conferred upon the Association by the plaintiffs' efforts; and, if so, whether the egregiousness of their unclean hands is such that they should be denied the recovery of attorneys' fees and expenses in whole or part.

During the course of the litigation, both groups maintained that the other's proxy solicitation materials were defective. In its memorandum opinion, the court found both sets of materials to be somewhat misleading. Notwithstanding this finding, the court did not choose to deny all relief requested by the parties, concluding that the best interest of the members of the Association would not be served by requiring them "to continually live with the results of a tainted election." Accordingly, the court ruled that the election of directors at the annual meeting of the Association in January, 1981 must be set aside; the court subsequently appointed an interim board of directors to serve until the next annual meeting. The basis of this determination was a finding that defendants' proxy materials were materially false and misleading in violation of applicable federal law. This was the result sought by the plaintiffs through prosecution of this lawsuit. The court now concludes that the results obtained because of plaintiffs' efforts in this lawsuit conferred a substantial benefit upon the members of the Association. In view of this finding, it is now incumbent upon the court to determine whether the plaintiffs are entitled to an award of reasonable attorneys' fees and expenses of litigation incurred by them in this lawsuit.

While attorneys' fees and expenses incurred in litigation are not ordinarily recoverable in the absence of a statute or contract authorizing them, there are well established exceptions. One such exception is a situation where a party, by his own efforts and expense, has created or preserved a fund, or in other ways benefited others. *Mills v. Electric Auto-Lite Company*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). The rationale of *Mills* and like decisions is that success in prosecuting and establishing violations of federal securities laws confers a benefit on the corporation (and thus on all the shareholders). Further, to prevent an

unjust bearing of expense, "all those who benefit from the litigation should share the cost proportionately." *Kahan v. Rosenstiel,* 424 F.2d 161, 166–67 (3rd Cir.1970), *cert. denied,* 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970). *See also Dillon v. Berg,* 482 F.2d 1237 (3rd Cir.1973) and *Reiser v. Delmonte Properties Co.,* 605 F.2d 1135 (9th Cir.1979).

Based on the foregoing, the finding that the plaintiffs' efforts have conferred a benefit on the Association, without more, should lead to an award of reasonable attorneys' fees and expenses of litigation. However, under the facts and circumstances of this case, this is only the first of a two phase determination required to resolve plaintiffs' current motion. Also to be considered is the court's finding that the defendants were guilty of unclean hands. While the court has not found a case exactly on point, it concludes that under general equity principles, an appropriate test to determine the nature of any award due plaintiffs would be to weigh the benefits conferred against plaintiffs' unclean hands.[1] Thus, the question remaining is whether the finding of unclean hands under the facts

and circumstances of this case is of sufficient gravity to bar recovery by the plaintiffs of all or any part of their claim for reasonable attorneys' fees and expenses of litigation. Applying the above-stated test, and reconsidering the applicable facts and law, the court now concludes that plaintiffs are entitled to reasonable attorneys' fees and expenses, but that the quantum of recovery must be discounted because of their unclean hands.

In making a determination of the remaining issue the court is not unmindful of the financial status of the Association and the highly expensive nature of this litigation.[2] The court is provided some guidance in its decision by the various securities cases cited and is obligated to consider the factors set forth in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974) regarding the reasonableness of the plaintiffs' claim.

Based on an examination of the record, it appears that the total claim of the plaintiffs for attorneys' fees and expenses of litigation through February 2, 1982, was $178,762.94.[3] Apparently, this is the amount

---

**1.** The court's allowing of some of the attorneys' fees and expenses incurred by the plaintiffs in the prosecution of the litigation notwithstanding the court's prior finding of unclean hands might at first blush appear to conflict with the maxim "one who comes into equity must come with clean hands and keep those hands clean throughout the pendency of the litigation . . . ." *See Gaudiosi v. Mellon,* 269 F.2d 873, 881 (3rd Cir.1959). In this case, the court has sought, upon reconsideration, to reach a reasonable result under the peculiar facts and circumstances of this case. While the court is required to apply equitable principles in this case, it is not required to reach an illogical or unfair result. *See Union Pacific Railroad Co. v. Chicago and North Western Railway Co.,* 226 F.Supp. 400, 410 (N.D.Ill.1964). Also, in comparing benefits conferred with wrongdoings, the court is not comparing the egregiousness of one party's violation with the misconduct of the other party, which Judge Latchum declined to do in *Chris-Craft Industries, Inc. v. Independent Stockholders Committee,* 354 F.Supp. 895, 921–922 (Del.1973).

**2.** The evidence presented in this case showed that the financial position of the Association was not very strong during the period under consideration, 1975–1978. Net profits were re-

alized in 1976, 1977, 1978, and 1979; but losses were sustained in 1975, 1980 and 1981. The proxy contest and the ensuing litigation in this case has proved to be a very expensive undertaking, with plaintiffs incurring expenses in the amount of $178,762.94, and the defendants incurring expenses of $118,529.81, with the total expenses incurred through the end of the trial approximating $300,000.00. This magnitude of expenses might be customary in stock fights involving major corporations. It does not appear to be a common occurrence in the savings and loan industry. *See Dillon v. Berg,* 351 F.Supp. 584 (D.Del.1972) where the attorneys for the plaintiff sought attorneys' fees of $250,-000.00 and expenses of $37,655.16 for the prosecution of two actions and *Chris-Craft Industries, Inc. v. Independent Stockholders Committee, supra,* where the plaintiffs sought reimbursement for expenses in the amount of $499,-689.00 and the defendants sought reimbursement for expenses in the amount of $498,-377.44.

**3.** The figure of $178,762.44 was arrived at from an examination of information contained in affidavits filed by the attorneys for the plaintiffs after the trial ended. The supplemental affidavit of Richard H. Sinkfield, Esq. (of Rogers &

that the plaintiffs claim they should recover in the motion for reconsideration. It is clear that no part of the expenses incurred in the proxy solicitation contest should be considered. Since the court is only concerned with attorneys' fees and expenses directly relating to the prosecution of the lawsuit, that portion of the plaintiffs' claim incurred by the King group in the proxy solicitation contest must be deleted. Upon an examination of the evidence presented, it appears to the court that the amount that the individual plaintiffs might reasonably claim as attorneys' fees and expenses of litigation is $145,869.18.[4]

The court has already determined that under the facts and circumstances of this case the plaintiffs are not entitled to recover the full amount of their claim. In determining the amount of discount to be applied to the amount claimed for attorneys' fees and expenses of litigation, the court is called upon to weigh and compare intangible factors. In the opinion of the court, the benefit conferred upon the Association by the efforts of the plaintiffs outweighs any taint placed on their efforts because of unclean hands. Notwithstanding this finding, the court cannot disregard plaintiffs' unclean hands, and this factor must be dealt with accordingly. Upon consideration of all relevant factors, the court now determines that an appropriate discount to be applied to plaintiffs' claim because of their unclean hands is one-third; thus, allowing recovery of two-thirds (or 66⅔ percent) of their claim. Accordingly, the court holds that the plaintiffs are entitled to recover against the Association $97,246.12 as attorneys' fees and expenses of litigation. Further, the Association shall be allowed a period of 180 days to satisfy the attorneys' fees and expenses herein awarded, and the award shall not bear post-judgment interest until the expiration of that period of time.[5]

It is hereby ORDERED and ADJUDGED that the memorandum opinion and the final

Hardin) showed that his law firm had billed the plaintiffs $143,373.59 and that one of the plaintiffs (Mr. King) had directly paid expenses in the amount of $23,389.35. The affidavit of Marvin S. Arrington, Esq. set forth attorneys fees in the amount of $12,000.00 for services rendered to the plaintiffs from November 1, 1981 to February 1, 1982.

4. The figure of $145,869.18 is arrived at through an examination and analysis of the affidavits submitted by the attorneys for the plaintiffs, plaintiffs' Exhibits 34 and 35, together with supporting time sheets submitted into evidence. Generally, the court has determined that the fees and expenses billed by Rogers & Hardin prior to the filing of the lawsuit were incurred in connection with the proxy contest. It appears to the court that this figure is $19,-468.50 as attorneys' fees and $468.78 as expenses. Specific reference is made to the bill dated January 20, 1978. Also, the court has determined that part of the expenses paid directly by Mr. King were incurred in the proxy solicitation contest and not as expenses involved in the prosecution of the lawsuit. In this regard, it appears to the court that of the amount paid directly by Mr. King, $12,956.48 related directly to the proxy solicitation contest and not expenses incurred in the lawsuit. It appears clear to the court that the balance paid by Mr. King in the amount of $10,432.87 for expert testimony and trial transcripts is part of the expenses of litigation. In summary, it appears to the court that $32,893.76 must be deducted from plaintiffs' total claim in order to arrive at the attorneys' fees and expenses of litigation directly related to the prosecution of the lawsuit. The court has already ruled that all expenses incurred in the proxy solicitation contest were the personal obligations of the parties incurring such expense.

5. The plaintiffs have sought to justify the reasonableness of their claim for attorneys' fees and expenses in accordance with the guidelines set forth in *Johnson v. Georgia Highway Express, Inc., supra.* The court has considered and analyzed plaintiffs' showing in light of the mandates of the *Johnson* case. The court, with the reservations hereafter set forth, has determined that they have carried the burden of proof required of them, as to time and effort, complexity of case, expertise and skill of lawyers, etc. While the court has not found the allowable portion of the claim ($145,869.18) to be unreasonable, it is noted that it exceeds the total incurred by defendants ($101,143.28). The court feels that large amounts of expenses incurred for the service of expert witnesses by both sides might be open to question. Further, had not the court discounted the plaintiffs' claim for the reasons stated, it would have seriously considered reducing the amount of recovery based on the financial condition of the Association. *See Dillon v. Berg, supra.* The current financial condition of the Association is the reason for allowing deferred payments of the award made to the plaintiffs.

order are hereby modified to reflect the findings and conclusions contained in this order and so as to contain an award of attorneys' fees and expenses of litigation in favor of the individual plaintiffs and against Peachtree Federal Savings and Loan Association in the amount of $97,246.12. It is further ORDERED that in all other respects, the memorandum opinion and final order of this court are to remain in full force and effect.